**UNITED STATES of America,**
Plaintiff

v.

Hubert A. TYLER, United Fire and Casualty Company of Cedar Rapids, Iowa, a corporation, the Home Indemnity Company of New York, a corporation, Defendants.

Civ. No. 874.

United States District Court
N. D. Iowa,
Central Division.

July 23, 1963.

Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, A. J. Metcalf, U. S. Dept. of Agriculture, Chicago, Ill., for plaintiff.

D. R. Newbrough, Ames, Iowa, Haupert, Robertson & Johnson, Marshalltown, Iowa, John Paul Jones, W. C. Hoffman, Des Moines, Iowa, for defendants.

HANSON, District Judge.

This Memorandum and Order has been precipitated by a Motion to Dismiss or for Judgment on the Pleadings by The Home Indemnity Company of New York, one of the defendants in the above entitled cause.

The United States of America, plaintiff in this cause, complains against the warehouseman and sureties on their bonds for damages sustained by reason of the warehouseman's failure to deliver to the Commodity Credit Corporation grain pursuant to warehouse receipts. One of the defendants in said cause is the warehouseman himself and another defendant is a surety known as the United Fire and Casualty Company of Cedar Rapids, Iowa.

By reason of the nature of the submission, the allegations of the Complaint and the admissions of Home Indemnity Company's Answer become highly material in the ultimate disposition of the submission at hand. It is the affirmative disclosures of plaintiff's Complaint that brings about the possible solution under Rule 12(b) or alternatively under Rule 12(c) of the Federal Rules of Civil Procedure.

Both the plaintiff and the defendants substantially say that the action is brought by the United States of America as the real party in interest based on a claim of Commodity Credit Corporation, its wholly owned corporate agency and instrumentality. Jurisdiction over this matter is conferred on this Court by 15 U.S.C. § 714b(c).

It appears without question that on or about the 18th day of June, 1955, Hubert A. Tyler, doing business as Tyler Elevator, Ellsworth, Iowa, entered into a written Uniform Grain Storage Agreement with Commodity Credit Corporation.

It is admitted by the defendant that The Home Indemnity Company of New York, as surety for the defendant, Hubert A. Tyler, made, executed and delivered a penal bond to the State of Iowa conditioned upon the principal's faithful performance of the duties of a warehouseman licensed under the provisions of Chapter 543 of the Code of Iowa, I.C.A., and that they also executed a rider to said bond on or about September 12, 1959.

The plaintiff in its Complaint in substance indicates as follows:

Pursuant to the aforesaid Uniform Grain Storage Agreements, Commodity delivered or caused to be delivered to the warehouseman 322,464.01 bushels of corn which the warehouseman received and accepted for storage and for which the warehouseman issued to Commodity warehouse receipts.

Thereafter, beginning about September 4, 1958, and continuing to about December 4, 1959, Commodity surrendered to the warehouseman the above described warehouse receipts and directed the warehouseman to load out and redeliver for its account the corn represented by said warehouse receipts, the same being all of Commodity's corn in store with the warehouseman.

Notwithstanding the foregoing, the warehouseman loaded out and redelivered to Commodity only 280,104.27 bushels of corn, leaving a shortage of 42,359.74 bushels of corn, which quantity of corn the warehouseman had wrongfully converted to its own use. In addition to such quantity shortage, the corn loaded out and redelivered by the warehouseman was of a lower grade in quality than that specified in the applicable warehouse receipts surrendered by Commodity.

Commodity, from time to time during the period herein involved, caused to be disbursed to the warehouseman certain payments for warehousing services performed in and about the aforesaid corn. During the period herein involved, the warehouseman failed to keep in store at all times in his warehouse facility described in the aforesaid Uniform Grain Storage Agreements a quantity and quality of corn equal to all outstanding corn storage obligations. Moreover, during the period herein involved, the warehouseman converted, as hereinbefore alleged, 42,359.74 bushels of Commodity's corn to his own use. By reason of the aforesaid breaches by the warehouseman of said Uniform Grain Storage Agreements, Commodity overdisbursed to the

warehouseman payments for warehousing services performed in and about said corn in the sum of $30,047.11.

By reason of the warehouseman's aforesaid breaches of said Uniform Grain Storage Agreements, Commodity Credit Corporation has been damaged in the sum of $82,194.37. The warehouseman is entitled to an offsetting credit against said sum of $82,194.37 in the amount of $14,997.31. Accordingly, plaintiff has been damaged by the aforesaid breaches of said Uniform Grain Storage Agreements by defendant Hubert A. Tyler in the sum of $67,197.06.

Defendant, The Home Indemnity Company, is a New York corporation, doing business in the State of Iowa, and within the jurisdiction of this Court.

In compliance with conditions precedent imposed upon defendant Hubert A. Tyler, doing business as Tyler Elevator, Ellsworth, Iowa, to obtain a license under the provisions of Chapter 543, Code of Iowa, I.C.A., defendant Hubert A. Tyler as principal and The Home Indemnity Company of New York, as surety, made, executed and delivered a certain bond, in the penal sum of $87,000.00, to the State of Iowa, for the use and benefit of any person lawfully entitled to receive the same in compensation for damages growing out of the operation by the principal of said licensed warehouse under the provisions of Chapter 543, Code of Iowa, I.C.A., and conditioned upon the principal's faithful performance of the duties of a warehouseman licensed under said statute, including all additional obligations as a warehouseman which the principal may assume under contracts with depositors of agricultural products in his said licensed warehouse. On September 12, 1959, said defendants as principal and surety executed a rider to said bond increasing the penal sum thereof to $137,000.00.

By reason of the principal's aforesaid breaches of his contractual obligations assumed by him with Commodity Credit Corporation, a depositor of agricultural products in his warehouse licensed under the provisions of Chapter 543, Code of Iowa, I.C.A., the conditions of the aforesaid bond and riders have been breached by said principal to plaintiff's damage, in the amount of $67,197.06, and there is now due and payable to plaintiff from defendant, The Home Indemnity Company of New York, the aforesaid sum of $67,197.06.

█ Plaintiff, in its sovereign capacity, and under the provisions of Article 6, Clause 2, of the Constitution of the United States, is authorized to sue defendant surety on the aforesaid bond and riders to protect and enforce its contractual and property rights.

█ On or about May 20, 1958, defendant The Home Indemnity Company of New York executed and delivered to Commodity Credit Corporation a certain rider to the aforesaid bond. Defendant The Home Indemnity Company of New York, because of execution and delivery of said rider to Commodity Credit Corporation, is now estopped to deny plaintiff its rights to enforce the terms of said bond and riders to recover for the principal's breaches of the Uniform Grain Storage Agreements hereinbefore alleged.

The United States alleges that Commodity Credit Corporation entered into an agreement with Tyler to store grain. Commodity is required by federal statute to store grain only with a warehouseman who has posted a sufficient bond.

A warehouseman in Iowa must also meet certain statutory requirements relating to posting a bond to insure the faithful operation on the part of the warehouseman. Home Indemnity was a surety on the bond posted by Tyler. This bond evidently met the requirements of the Iowa statute requiring the warehouseman to post bond.

█ The United States alleges that Home Indemnity assented to act as surety on the contract between Commodity and Tyler to store grain belonging to Commodity. For purposes of this motion to dismiss, the allegations of the United States must be taken as true and capable of being proven at the trial of this cause.

Before the Commodity Credit Corporation would accept the surety, the limits of possible liability on the bond had to be raised. This was done by certain riders to the bond.

The defendant, Home Indemnity Company of New York, by way of Paragraph 11 of its Answer, and in further Answer to plaintiff's complaint, state as follows, to-wit:

"Further and by way of affirmative defense, this defendant states that the Complaint of the Plaintiff, United States of America, fails to state a claim upon which relief can be granted in that said Complaint shows upon its face and in conjunction with Exhibits "H", "I", and "J" therein referred to, that the plaintiff is not one of those persons or classes of persons lawfully entitled to receive of this defendant compensation for damages growing out of the operation of the Tyler Elevator under the provisions of Chapter 543, Code of Iowa."

The issues here raised on the Motion are in substance:

(1) Is there some type of contractual liability which has been incurred by the defendant that can properly be submitted for final disposition based upon the pleadings of the plaintiff;

(2) Whether or not there is in substance a submissible question on the principle of estoppel; and,

(3) May the plaintiff maintain this action against the Indemnity Company, defendant, predicated and based upon the provisions of the state of Iowa as disclosed in Chapter 543, Code of Iowa, I.C.A.

These problems are not completely new in this area. The problem of grain conversion and liability of bonded warehousemen has been a serious disturbance for some time last past. The United States Court for the Northern District of Iowa was faced with the proposition of issue No. 3 above set out in Civil No. 818, Central Division, entitled United States of America v. West View Grain Company and St. Paul Mercury Indemnity Company, and in Civil No. 1076,

Western Division, entitled United States of America v. D. E. Benton Company and St. Paul Mercury Indemnity Company, D.C., 189 F.Supp. 482.

This Court is faced with a companion case in this instance which involves United States of America v. Merchants Mutual Bonding Company, Western Division, D.C., 220 F.Supp. 163, and the present case under consideration, No. 874, Central Division. Opinions in the two causes are being submitted simultaneously by reason of their identical issues.

As has been indicated, the Court must now answer all of the issues above set out by reason of the fact that in one of the cases now under consideration, the case has been fully and finally submitted without a Motion to Dismiss or Motion for Judgment on the Pleadings, that being cause No. 1201, United States v. Merchants Mutual Bonding Company

## CONCLUSIONS

### ADDITIONAL CONTRACTUAL LIABILITY:

Defendant, Home Indemnity Company of New York, filed a motion to dismiss on the grounds that their liability and obligation can rise no higher than that which can be predicated upon the statutory bond which is required by Iowa law for warehousemen under Chapter 543 of the Iowa Code, I.C.A., as such statute existed at the time the agreements in question were made. The defendants allege that under the statutory bond required by this Chapter as it then existed, a surety on the bond would have no obligation to insure the warehouseman's faithful performance contracts for storage of grain with Commodity Credit Corporation.

If, for the moment, the allegation mentioned above of Home Indemnity is taken as correct, and the allegation of United States that Home Indemnity did assent to act as surety for Tyler on the grain storage contracts between Tyler and Commodity is taken as correct, then the surety would have taken on an obligation

additional to those obligations required of it under the bond issued pursuant to Chapter 543, Code of Iowa, as it then existed.

This raises the question as to whether this obligation additional to the obligations in the statutory bond is enforceable or whether a statutory bond should be limited to the obligations required by the statute despite a broader intention by the parties involved.

Iowa law controls as to what the Iowa statute was intended to mean. However, federal law controls the rights of Commodity under its contracts. United States v. McCabe Co., 261 F.2d 539 (8th Cir. 1959).

The law is settled that a surety is bound by what he has assented to. Mundy v. Stevens, 3 Cir., 61 F. 77; Leach v. Commercial Sav. Bank, 205 Iowa 1154, 213 N.W. 517, 527; United States v. McMullen, 222 U.S. 460, 32 S.Ct. 128, 56 L.Ed. 269 (Holmes J.); R.S. of Surety, Secs. 83, 85, 88.

The undertaking of a paid surety engaged in that business for profit is considered by the Iowa Court to be controlled by the rules applicable to insurance contracts rather than by rules applied to an accommodation surety. Rowe v. Stufflebeam, 249 Iowa 985, 89 N.W.2d 875, 878, 879. The same rule was applied in Massachusetts Bonding & Insurance Co. v. Feutz, 182 F.2d 752 (8th Cir. 1950).

In the present case, the meaning of the bond and the rider is ambiguous because the meaning of the rider which is part of the bond must be reconciled with the surety's allegation that the United States cannot sue on the bond.

There are also a number of other ambiguities that must be interpreted. Was the notice in the rider to supplement the notice in the bond wherein Section 543.23 is referred to? Also, what is the significance of the specific reference to Section 543.23? When the condition states " * * * shall faithfully perform the duties of a licensed warehouseman * * *," does this mean all of the ware-houseman's duties under the statute or does this in some way mean a limited number of his obligations? It is clear from the statute that the warehouseman has obligations to all depositors and that the United States can be a depositor. When the bond refers to " * * * warehouse receipts that are then outstanding * * *," does this mean all of the warehouse receipts of the warehouseman then outstanding? When the bond refers to " * * * obligations as to such outstanding receipts shall continue * * * in accordance with Section 543.23 * * *," does this mean all warehouse receipts referred to in Section 543.23? Is that part of the bond which reads: " * * * for the use and benefit of any persons lawfully entitled to receive the * * * compensation for damages growing out of the operation of said warehouse under the provisions of Chapter 543 * * *" inconsistent with the other parts of the bond mentioned above? Also, the Court must give meaning and reason to the rider. Why did Home Indemnity Company grant the rider? Why was the principal sum of the bond raised?

Recourse must be had to the circumstances and other documents known to all parties in order that the Court may determine their intent. Peterson v. Miller Rubber Co., 8 Cir., 24 F.2d 59; Massachusetts Bonding & Insurance Co. v. Feutz, supra.

A contract of suretyship is normally between the surety and his principal; in this case, Hubert A. Tyler and Home Indemnity Company. The obligee or beneficiary, in this case Commodity, is in the nature of a third-party beneficiary. The surety is bound to those obligees or beneficiaries that he has assented or agreed to be bound to. In this case, the question is whether the bond, the rider, and the other circumstances show that the surety agreed to be bound to the United States.

The standard used to determine whether or not this agreement was made is an objective one. The rule is well known. Castor v. Coppock, 211 F.2d 136

(8th Cir. 1954); Corbin on Contracts, Section 104; Restatement of Contracts, Sections 233 and 228. See also Comment (a) of Section 228 in Restatement of Contracts and the Comments under Section 228 in Iowa Annotations to Restatement of Contracts. Also Section 622.22 of the Iowa Code, I.C.A. This rule is that Home Indemnity Company is bound by that meaning of its words which it knew or had reason to know that the other parties would give to the words. This rule applies where the intention of the parties is unclear, or in the words of the Restatement, where there is no integration. There is no integration in the present case. The bond designates the beneficiaries unclearly. It designates them as those to whom duties are owed under Chapter 543 and as those who may lawfully receive compensation for damages out of the operation of the warehouse under Chapter 543. Also, because of the rider, there is evidence that they specifically intended that Commodity was to be a benficiary under the bond.

It may be that if the bond alone was being interpreted, this standard of interpretation would not be used, but in order to determine whether Home Indemnity Company expressly agreed that the United States was to be a beneficiary under the bond, the bond itself, the rider, and the surrounding circumstances must be considered and the standard of interpretation which must be used is that statement set out above in Castor v. Coppock, supra, and the other authorities cited. But see also R.S. of Contracts, Section 231.

 The present case takes on some of the aspects discussed by Corbin on Contracts, Sections 792 and 793. These things bothered Corbin when used only to get around a requirement of privity, but in this case, this theory fits the facts of the case. Certainly, there is no reason why the beneficiary cannot make a direct agreement with the surety. R.S. of Surety, 83, 85, 88.

The reason no express written agreement was made between the parties showing that they all intended that Commodity was to be covered by the bond is undoubtedly because they all at that time believed the United States was already covered by that bond, and could sue on the bond under Section 543 of the Iowa Code.

 There are a number of reasons why the Court feels the bond itself shows that the parties intended the United States was to be covered by the bond before the rider was ever signed. The Court takes note of the fact that the bond itself makes special reference to Section 543.23. The bond states that if the surety shall desire to cancel the bond, it would remain in effect as to outstanding receipts in accordance with Section 543.-23. Section 543.23 deals with termination of storage contracts. This Section states that a storage contract shall have a forced termination: "On termination or lawful cancellation of bond provided and failure of the warehouseman to immediately replace same."

Section 543.24 says that "In the event of forced termination of a storage contract as provided in section 543.23, the warehouseman shall provide such reasonable opportunity as the circumstances will permit for the depositor or other person entitled to delivery of the storage products to take possession of the storage product." The reasonable interpretation of this part of the bond is that the warehouseman did not want his storage contracts all terminated if the surety would suddenly terminate its bond.

When you say that the United States is not covered by the bond, you are saying that when "receipt" is mentioned in the bond, it means all the receipts referred to in Section 543.23 except the United States receipts. This exception is not expressed but unless it is construed to be in the bond, the phrase "storage contract" in Section 543.23 cannot include the United States storage contracts and the word "depositor" in Section 543.-24 cannot include the United States. In other words, to conclude that the United States is not covered by the bond is to

·conclude either that no duty is owed to the United States under Sections 543.23 and 543.24, or it is to conclude that the obligations owed to the United States by the warehouseman are greater than the obligations owed to the United States by the warehouseman's surety. There are able reasons why neither of these latter two conclusions could have been intended. First, the condition of the bond states that it will guarantee the duties of a licensed warehouseman in conformity with the provisions of said Chapter 543. Here again you would have to say either that it does not cover duties owed to the United States or that no duties are owed under these statutes to the United States.

Secondly, you cannot help reaching the conclusion that there are duties under Chapter 543 which can be owed by warehousemen to the United States.

 Section 543.28 shows that it is contemplated that the United States would be a depositor in the licensed warehouse. Section 543.18 states that warehouse receipts shall be issued for all agricultural products that become storage in a licensed warehouse. This conclusively shows that when the United States (as contemplated in Section 543.-18(3)) becomes a depositor, a receipt must be issued to the United States. Section 543.18(3) states that this receipt must be issued subject to the Iowa Bonded Warehouse Act and the rules and regulations prescribed thereunder. This is conclusive that duties can be owed by the licensed warehouseman to the United States. When the surety, the warehouseman and the depositor entered into this bond, they could hardly have intended the surety to have fewer obligations to the depositor than the warehouseman. Yet, if you say that the United States is not intended to be covered by this bond, that is the distinction in obligations which must be read into its guarantee of the warehouseman's performance.

Under Section 543.23, a storage contract has a forced termination if the bond is cancelled and is not immediately replaced. Therefore, if the United States storage contract was not covered by the bond it did not, in this particular case, have lawful existence under this statute. Section 543.24 talks of the depositors under the storage contracts which are considered in 543.23. It seems clear that Section 543.23 meant storage contracts to exist only when insured and bonded. The only way they could exist is if "storage contract" in Section 543.23 does not include United States storage contracts.

No one knew at the time this bond was executed what meaning would be given to Section 543.14 by the courts as it had not been previously interpreted.

The bond does say that it is for the use and benefit of any *persons* lawfully entitled to receive compensation for damages growing out of the operation of said warehouse under the provisions of Chapter 543. If the United States is not a person in this clause, it is inconsistent with literal words of other parts of the bond. Certainly when this Section is considered, and when the other language of the bond is considered, it was reasonable for Commodity to believe that the United States was intended to be covered by the bond.

Indemnity Insurance Co. of North America v. United States, 5 Cir., 74 F.2d 22, and United States v. Tingey, 5 Pet. 115, 30 U.S. 115, p. 128, 8 L.Ed. 66, show that where a bond was by mistake or otherwise voluntarily substituted by the parties for the statutory bond, without any coercion or extortion, then it can be enforced notwithstanding the statute required different obligations than the parties intended and contracted for. Also on point are United States v. Hartford Accident & Indemnity, 2 Cir., 117 F.2d 503, and National Surety Corp. v. Peoples Milling Co., D.C., 57 F.Supp. 281. This is also the rule when the statute is declared unconstitutional. State to use of Brontrager v. Mundy, 53 N.D. 249, 205 N.W. 684.

The majority rule under the state law cases is that where the statute defines the conditions which a bond shall con-

tain, the statute does not prohibit additional conditions made by the surety. These cases are collected in 18 A.L.R. 1227 and subsequent supplements to that annotation. These agreements are called voluntary common law bonds. See 93 C.J.S. Warehousemen & Safe Depositaries § 15, p. 414.

 Moreover, if Home Indemnity did agree to act as surety on the government contracts, then even if this obligation is in addition to the obligations required of the surety under the statute, the effect of the statute upon this additional obligation in favor of Commodity would be governed by the rule of United States v. McCabe Co., supra. In that case, the court said that the rights of Commodity cannot be limited by a state statute or state rule of law. The court said that Congress had no intention to make the rights of Commodity subservient to state law. Therefore, if the agreement is an obligation of the surety in excess of the obligations required by the statute, the obligation is not predicated on the statute and the statute has no effect in preventing the enforcement of the obligation. There is no indication that the Commodity Credit Corporation intended that it should be bound by any state law in enforcing its contracts. Clause 21 reads as follows:

> "TERMS OF AGREEMENT TO PREVAIL—The terms of this agreement including the schedule of rates shall prevail over the written or printed terms of the warehouse receipts representing the grain, over the warehouseman's applicable tariff or posted rates, and over state and local regulatory laws and rules to the extent that such laws or rules may be inconsistent herewith."

Also Chapter 543, Section 12, expressly allows warehousemen by bond to cover obligations on their contracts in addition to the statutory obligations.

Based upon the general rules with relation to the matter of a Motion to Dismiss or for Judgment on the Pleadings, it appears to the Court that the pleadings are sufficient to indicate full submission and that the citation of additional authorities on this subject would be of no particular significance.

ISSUE OF ESTOPPEL:

 The United States also alleges that the surety is estopped from asserting that the obligations under the statute are different from the obligations arising out of the agreement among the parties by which the surety assented to act as surety on the grain storage agreements between Tyler and Commodity. Estoppel does not create a contract but the general rule is that if in making a contract, the parties agreed upon or assumed the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact as long as the contract stands, in the absence of fraud. Triphagen v. Labbe, 332 Mich. 583, 52 N.W.2d 226 (1952); 19 Am.Jur. 634, Sec. 34; Woodard v. General Motors Corporation, 298 F.2d 121 (5th Cir. 1962). This rule has been applied where the fact assumed was a question of the interpretation of a statute. Carroll v. National Surety Co., 58 App.D.C. 3, 24 F.2d 268; Sisseton v. Western Surety Co., 50 S.D. 205, 208 N.W. 982; Bell v. Kirkland, 102 Minn. 213, 113 N.W. 271, 13 L.R.A.,N.S., 793; Fidelity and Deposit v. Madson, 202 Wis. 271, 232 N.W. 525; American Surety Co. v. City of Akron, 6 Cir., 95 F.2d 966; Hartford Acc. & Indemnity v. United States, 127 F.Supp. 565, 130 Ct.Cl. 490.

 This question was raised on a motion to dismiss and it is, therefore, assumed that the agreement can be proved to be what the government alleges it to be and that the necessary elements for an estoppel can be proven. It may be helped somewhat by the allegation of Home Indemnity that the surety must be assumed to have known the meaning of the statute, and the presumption that the surety knows the contents of his principal's contracts. Hartford Acc. & Indemnity v. United States, supra.

Here again on this issue, the pleadings are sufficient for submission of the question.

▆ In addition to the above matter of estoppel, there are some manifestations with relation to the matter of assignments. As for the warehouse receipts assigned to Commodity from individuals who had originally received them from Tyler, there is no good reason why they do not carry the security of the bond with them. The rule is that the assignment of a claim carries with it the security on the claim which was held by the assignor. Brainerd, Shaler & Hall Quarry Co. v. Brice, 250 U.S. 229, 39 S.Ct. 458, 63 L.Ed. 951; United States v. Fleming, D.C., 69 F. Supp. 252; Bank of Wadesboro v. Northwestern Casualty & Surety Co., 202 N.C. 148, 162 S.E. 236; Restatement of Contracts Section 171(2).

▆ If the judgment, if any, by the plaintiff will protect the defendant from future annoyance or loss, and where, as against the parties suing, the defendant can urge any defenses he could make against the real owner of the claim, then there is an end of the defendant's concern as to the protection he is afforded by having the claim prosecuted by the real party in interest. Blair v. Espeland, 231 Minn. 444, 43 N.W.2d 274.

▆ There is no public policy against the assignments in this case. It has been contended that this is like the situation under the Small Loan Law where the loan company cannot assign its claims and the assignee collect the rate of interest that the loan company is allowed to collect. This situation is quite different. There has been a special privilege conferred on the loan company. The law has a policy against high interest rates and must control those who have the license to charge high rates. There is no such policy in the law against the assignments in this case. The law generally favors free assignability of contracts. See Iowa statute 539.2. This assignment is most closely analogous to the assignment of beneficial interest in an insurance policy and that is allowed where not against public policy.

## ACTION BASED UPON CHAPTER 543, CODE OF IOWA, I.C.A.,

This third issue is of great concern in the ultimate disposition of this type of case. Here we have the construction and interpretation of a legislative enactment as proclaimed in Chapter 543 of the 1958 Code of Iowa, I.C.A. In addition to this, the Court is faced with the persuasive and scholarly opinion written in United States v. West View Grain Company, D.C., 189 F.Supp. 482. At one juncture, the eminent trial court mentioned a citation of the Iowa Supreme Court, as follows, to-wit:

"To sustain plaintiff's argument would be to hold the legislature did not mean to say what the language it used plainly means. It is pertinent to repeat here the much quoted admonition of the late Justice Oliver Wendell Holmes, 'We do not inquire what the legislature meant. We ask only what the statute means.' * * "

Many statements have been made with relation to the search for legislative intent. It has been referred to as being elusive. This reference amounts to understatement in the case at hand. The great jurist Hand has indicated that a search for legislative intent constitutes a reason for the existence of judges and indicated, in his words, that to find it constitutes a "delightful uncertainty."

The ruling in the West View case, supra, is purely confined to the matter of an interpretation of the statute, the court in said cause having stated that there were other phases which were to be determined later. The other phases have been raised in this cause in the first two issues indicated. The West View case was closed in such a manner as never to result in a final appealable order. This was so by reason of the matters left undetermined and by reason of settlement.

The Indemnity Company claims that under a proper statutory construction, Chapter 543 of the Code of Iowa as it existed at the time of liability on any

bond given by them excluded the United States as an entity entitled to bring action for recovery on said bond. Actually, the entire Chapter must be looked upon for proper consideration of the ultimate result reached herein.

The legislative history as proclaimed in the West View case, supra, indicates the various steps and changes made from time to time since its enactment except since the time of the decision, the decision having been rendered on December 2, 1960. On March 6, 1961, at the very next session of the Legislature subsequent to the rendering of this decision, Chapter 267 of the Laws of the Fifty-Ninth General Assembly, being House File 49, was enacted. The statute as it existed prior to March 6, 1961, is hereinafter set out and the Chapter as it is today and subsequent to March 6, 1961, is hereinafter set out. In practically all instances, and in particular as the present statute was enacted in Chapter 246 of the Laws of the Fiftieth General Assembly, the title has been "Bonded Warehouses for Agricultural Products Act." It has in most instances been referred to as relating to bonded warehouses for agricultural products. The Act itself removes any doubts as to its purpose whatsoever.

The pertinent provisions of the Iowa Code as indicated prior to March 6, 1961, were provisions in being at the time of the allegations of liability in this cause as follows, to-wit:

"543.1 *Terms defined.* As used in this chapter: \* \* \*

"7. 'Person' shall mean an individual, corporation, partnership, or two or more persons having a joint or common interst in the same venture, but shall not mean the United States or Iowa state government or any subdivision or agency of either. \* \* \*"

"543.12 *Bond required.* Any person applying for a license or licenses to conduct a warehouse or warehouses in accordance with this chapter shall, as a condition to the granting thereof, execute and file with the commission a good and sufficient bond, other than personal security, to secure the faithful performance of his obligations as a warehouseman under the terms of this chapter and the rules and regulations prescribed hereunder, and of such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agricultural products in such warehouse. Any person applying for an amended license under the provisions of section 543.8 shall, as a condition to the granting of the amendment to his license, file such additional or substituted bond or such amendment to a bond already on file as will result in a bonded liability in total effect equivalent to the bonded liability which would be required if such person were applying for an original license for the storage of agricultural products of types and in amounts specified in the application for an amended license."

"543.14 *Action on bond.* Any person injured by the breach of any obligation of a warehouseman, for the performance of which a bond has been given under any of the provisions of this chapter, may sue on such bond in his own name in any court of competent jurisdiction to recover any damages he may have sustained by reason of such breach."

"543.17 *Acceptance of bulk grain for purposes other than storage.* \* \* \* Provided, however, that in each instance of a deposit of grain by the United States government or any subdivision thereof, a period of thirty days shall be permitted in each instance where a period of ten days is above specified, and action which is specified above to be taken on the tenth day, shall be taken on the twenty-ninth day."

"543.19 *Rights and obligations with respect to warehouse receipts.* \* \* \* and privileges of licensed

warehousemen and other persons dealing with such warehousemen."

"543.24 *Sale of products in the event of forced termination.* In the event of forced termination of a storage contract as provided in section 543.23, the warehouseman shall provide such reasonable opportunity as the circumstances will permit for the *depositor or other person* entitled to delivery of the storage products to take possession of the storage product."

"543.27 *Discrimination.* \* \* \* without making any discrimination between persons desiring to avail themselves of warehouse facilities."

"543.28 *Rates.* \* \* \* Provided, however, that a storage or delivery charge other than that specified above may be made, if such charge is required by the terms of a written contract with the United States government, any of its subdivisions or agencies, providing copy of such contract is filed with the commission. \* \* \*"

These and other provisions of the statutes may from time to time be referred to.

After the decision in the West View case, supra, which occurred on December 2, 1960, and thereafter and on March 6, 1961, the following provisions of the Code as it relates to Chapter 543.1, subsection 7, is now as follows, to-wit:

"543.1. \* \* \* 7. 'Person' shall mean an individual, corporation, partnership, or two or more persons having a joint or common interest in the same venture, and, except with respect to the privilege of operating a warehouse under this chapter, shall include the United States or Iowa state government, or any subdivision or agency of either. \* \* \*"

The above set out sections of the 1958 Code of Iowa under the title of "Bonded Warehouses for Agricultural Products" have not been changed except that "person" has been redefined as set out in the 1962 Code above quoted. Thus, it may

be seen that as of now and subsequent to March 6, 1961, the problem here involved cannot arise by reason of the destruction of any possible ambiguity of meaning.

It is clear that the Iowa cases say many times that the amendment to an existing statute is intended only to clarify the statute and not to alter the scope and purpose of it. Disbrow v. Deering Implement Co., 233 Iowa 380, 9 N.W.2d 378 (1943); State ex rel. Iowa State Board of Assessment and Review v. Local Board of Review, 225 Iowa 855, 283 N.W. 87.

The meaning of the word "person" in Chapter 543 is not clear. It is ambiguous. With much deference to the well written ruling in the West View decision, the court feels that this is a statute where the manifest intent of the legislature must prevail over the literal import of the words used. Dingman v. City of Council Bluffs, 249 Iowa 1121, 90 N.W.2d 742. This is the type of problem where the intent must be gathered from the Act as a whole and not from the ambiguous words alone, as if they were isolated and independent of the Act of which they are a part.

It is true that the Legislature is its own lexicographer, but as the Supreme Court said in Lawson v. Suwannee Fruit & S. S. Co., 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611: "Statutory definitions control the meaning of statutory words, of course, in the usual case. But this is an unusual case. If we read the definition into § 8(f) (1) in a mechanical fashion, we create obvious incongruities in the language \* \* \*."

In United States v. Kurzenknabe, D.C., 136 F.Supp. 17, the court said you look to the intent of the Legislature when the literal words would bring about an end completely at variance with the purpose of the statute. The Iowa court has expressly recognized this rule of construction. Young v. O'Keefe, 246 Iowa 1182, 69 N.W.2d 534, 537. (Citing 82 C.J.S. Statutes § 315). In this case, the court was construing a well known word. In the case at point, the word "person" is

a well known word, but its normal meaning is inconsistent with the meaning attributed to it by the West View decision and the defendant, Home Indemnity Company. The United States is normally considered a juristic person. United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071; Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. The word "person" has no fixed and rigid signification. Commonwealth v. Welosky, 276 Mass. 398, 177 N.E. 656, 657; State of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346. This rule was also recognized in State v. City of Des Moines, 221 Iowa 642, 266 N.W. 41, 43. The rule was followed in Birmingham v. Geer, 8 Cir., 185 F.2d 82 at p. 86.

The court believes the meaning of the word "person" in the statute is unclear and that the statute defines the word "person" in an ambiguous manner. The court realizes that this same issue was considered in the West View opinion and that this decision here is not consistent with that opinion. This court feels that the interpretation of the statute in the West View case is against the manifest intent of the legislation and results in obvious incongruities. The court in the West View case apparently felt that the results were not such as to apply the rule this court is using, but there the court did feel that as a result of that decision, the doctrine of estoppel might be applicable.

Section 543.17 clearly shows that it was anticipated that the United States might deposit grain in warehouses licensed under this statute. Section 543.12 says that the bond is to cover all the warehouseman's obligations, plus any additional obligations assumed by the warehouseman under his contracts with his depositors. The word "all" here would certainly imply that it meant all obligations to depositors, especially where this section gives no contrary implication. In light of these two sections, it then does not make sense to say that the United States cannot sue on this bond

under Section 543.14. At this point, the meaning of Section 543.14 becomes unclear and must be construed in relation to the rest of the Chapter.

The word "person" is used in Section 543.12. There the word "person" was not intended to include the United States. The purpose of the exclusion was that the State of Iowa did not intend to regulate any warehouses owned or operated by the United States but the Legislature did intend that the United States should be able to deposit grain in warehouses owned privately and licensed by the State of Iowa; and further, the Legislature intended that when the United States did this, it would be able to be covered by the warehouseman's statutory bond. Section 543.17 shows that it was contemplated that the United States was going to deposit grain in the licensed warehouses.

The fact of the common practice of Commodity of taking assignments from the forms of their warehouse receipts, and the Iowa Legislature making these receipts negotiable would show that the Legislature expected that Commodity would be able to sue on this bond. If the United States could not sue on the bond, it would be impossible to negotiate the receipts because the United States would always have to first secure another surety. It is only with the doctrine that the assignment carries with it the surety that there can be an assignment of these negotiable warehouse receipts as intended by the Iowa Legislature. See Iowa Code Sections 542.3 through 542.7.

The general rules of law with relation to statutory construction have been clearly enunciated in Iowa. Where a statute is clear on its face, it is not open to construction, but where the statute is ambiguous the court must ascertain the intent of the legislators, and this is the settled rule in Iowa where the ambiguity arises from a disagreement as to the scope of certain words. Dingman v. City of Council Bluffs, supra; Ferguson v. Brick, 248 Iowa 839, 82 N.W.2d 849, 852. In the Dingman case, the Iowa court said

while quoting from the Ferguson v. Brick case:

"'While generally speaking, words of a statute are given their ordinary meaning, words ought to be more subservient to the intent and not the intent to the words. * * * In ascertaining such intent consideration should be given to the Act as a whole and not to the ambiguous words alone, as if they were isolated and independent of the Act of which they are a part.' (Citing cases)."

Statutory construction is properly invoked when the legislative acts contain such ambiguities or obscurities that reasonable minds may disagree or be uncertain as to their meaning. Palmer v. State Board of Assessment, 226 Iowa 92, 283 N.W. 415, 416; Dingman v. City of Council Bluffs, supra.

In Young v. O'Keefe, supra, the court stated that a legislative body may be its own lexicographer, but when it assumes the role of lexicographer, it must be treated as one. The court in that case said: "We are required here to interpret, not the language of the main pension provisions, but what purports to be the legislative definition of that language." The court in that case further said that "'[c]onstruction provisions' and 'definitions' may doubtless sometimes be themselves subject to judicial construction." In that case, the court was hesitant to construe the statutory definition because the purported legislative definition was the same as the well known meaning of the word. In this case, the opposite is true as the purported statutory definition is contrary to the accepted view of the United States as a jurisdic person. Far East Conference v. United States, supra.

In State v. City of Des Moines, supra, the court said in construing the word "person":

"Indeed, the Legislature itself has provided by statute, chapter 4, § 63, Code, under rules of construction that 'in the construction of the statutes, the following rules shall be observed, *unless* such construction would be inconsistent with the *manifest intent of the general assembly, or repugnant to the context of the statute,'* thus emphasizing the fact that the intent of the General Assembly is to override, if necessary, even the terms therein defined which are to govern ordinarily in the construction of statutes."

"Having ascertained from a consideration of the entire act and historical background revealed by prior statutes on the same subject the object and purpose which the law was intended to accomplish, it is the duty of the court to give it force and effect, if this can be done without running counter to established legal precedents. With the matter of the expediency of the measure we as a court are not concerned."

"Surely, in a sense, all corporations are persons, that is, artificial persons, and all municipalities are bodies corporate, and in a proper case the word "person" has been held to not only include municipalities but every and any political subdivision, and also the state, and in some cases even the United States government. Stanley v. Schwalby, 147 U.S. 508, 517, 13 S.Ct. 418, 37 L.Ed. 259, 263. See, also, 48 C.J. 1137, where many cases are collated bearing on the question."

"In a recent case, State of Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 727, 78 L.Ed. 1307, the Supreme Court of the United States said: 'Whether the word "person" or "corporation" includes a state or the United States depends upon the connection in which the word is found.'"

We have a legislative enactment here divided into numerous sections concerning the control and regulation of Bonded Agricultural Warehouses. In the case of Davis v. Davis, 246 Iowa 262, 67 N.W.2d 566, the Court subscribed to Section 352,

Title 50, Statutes, American Jurisprudence, which is as follows, to-wit:

"The different parts of a statute reflect light upon each other, and statutory provisions are regarded as in pari materia where they are parts of the same act. Hence, a statute should be construed in its entirety, and as a whole. The general intention is the key to the whole act, and the intention of the whole controls the interpretation of its parts. The fact that a statute is subdivided into sections or other parts should not obstruct or obscure the interpretation of the law as a whole. All parts of the act should be considered, compared, and construed together. It is not permissible to rest the construction upon any one part alone, or upon isolated words, phrases, clauses, or sentences, or to give undue effect thereto. The legislative intention as collected from an examination of the whole as well as the separate parts of a statute, is not to be defeated by the use of particular terms, but, to the contrary, will prevail over the literal import thereof."

 It would seem that the only purpose that could possibly be attached to the exclusion of the United States, the Iowa State Government, or an agency thereof as provided in Subsection 7, Section 543.1, is that of regulating the United States or the Iowa State Government as warehousemen, and that it has no application to their subsequently becoming a depositor or person under the protection of 543.14. The subsequent clarification in the 1962 Code clearly indicates this situation.

The purpose of this statute insofar as it relates to the matter of bond reduced to the most common understanding would be that it will protect those who have stored grain. The United States does not stand in the position of a warehouseman in these situations but stands squarely in the shoes of a depositor or person seeking relief from the bondsman by reason of an alleged breach. No one doubts the rule that if the United States brings itself within the provisions of a Legislative Act, it shall be permitted to pursue its remedy pursuant to the Act. Here the statute does not exclude the United States as a person. It excludes the United States as being regulated within the provisions of the statute as a warehouseman.

The legislative record is clear that Sections 543.12 and 543.14 were not only passed at the same time but in the same bill. Neither has there ever been any indication of change, and if the Legislature could have meant that the United States was not to be included within the provisions of 543.12, they could very well have said that the bond shall not be for the benefit of the United States or any agency or subdivision thereof. This they did not do. The Court in this instance feels that there is such an ambiguity as to justify this interpretation of the statute.

Every reason given for disallowing the United States the benefit of suit upon the bond must be predicated entirely upon the premise that the legislative enactment excludes it. It is the view of this Court reading this statute as a whole that the major premise is faulty, and in view of this, and in view of the ambiguity, the general rules of construction as they relate to the matter of ambiguity apply. The general law in support of the propositions as announced in the West View case are entirely correct if the view subscribes to excluding the United States by reason of Section 543.1, subdivision 7. A contrary view, which this Court believes, subscribes more closely to the provisions of the statute as a whole. Certainly, to apply rigidly the definition of "person" as subscribed to by the Indemnity Company in this cause leads to absurdity. These results can be and should be avoided. State ex rel. Pieper v. Patterson, 246 Iowa 1129, 70 N.W.2d 838.

Under the West View decision, the surety on the statutory bond has no obligations to the United States. Yet it is unmistakable that the warehouseman can have obligations to the United States.

This is another reason why Chapter 543.-14 is unclear and why the interpretation of it in the West View case does not accord with the intent of the legislators. Could the Act have intended the warehouseman's surety to have lesser obligations than the warehouseman? This Court does not believe that this was the intended result, but rather the Court believes that it was the intention of the Legislature that the surety was to cover all of the warehouseman's obligations and that even, as is stated in Section 543.12, it was to cover " * * * such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agriculture products in such warehouse."

The reasons why it is clear that the legislators must have intended that the United States would be a depositor and that warehousemen would owe obligations to the United States are already set out in this memorandum.

Also, the West View decision creates conflicts between the different Sections in the Chapter. As already explained, Sections 543.17, 543.18, and 543.28 contemplate storage by the United States in licensed warehouses. 543.18 says warehouse receipts must be issued for *all* agricultural products. Under 543.16, it would have been unlawful for Vust to have accepted for storage this grain if he had not done it as a licensed warehouseman. However, as already explained, if the United States is not a person entitled to sue under the statutory bond, then Commodity's storage contracts could not have been "storage contracts" as that term is used in Section 543.23. This is because storage contracts not bonded are automatically terminated and, therefore, could not come into effect if not bonded.

Under Section 543.15, the United States would be the holder of a licensed warehouse receipt and so would get the benefit of the required insurance. Could the United States have been intended to be covered by the insurance contracts, but not by the bond? The Court does not think this was the intent of the legislation. Could the Legislature have intended the United States to get the benefit of Section 543.15 but not the benefit of Sections 543.23 and 543.24? This Court believes this was not what was intended.

All these inconsistencies disappear if the United States can sue on the statutory bond. The Court feels that the Legislature did not intend the sections of the statute to be so inconsistent as to be absurd, but rather intended that they be consistent and that the United States could sue on the statutory bond.

It Is, Therefore, Ordered that the Motion to Dismiss or for Judgment on the Pleadings is hereby denied and overruled.