## CASTOR v. COPPOCK.
### No. 14815.

United States Court of Appeals, Eighth Circuit.
March 17, 1954.

Norman C. Parker, St. Louis, Mo. (Flynn & Parker and Francis C. Flynn, St. Louis, Mo., on the brief), for appellant.

Victor A. Wallace, St. Louis, Mo., for appellee.

Before JOHNSEN and COLLET, Circuit Judges, and NORDBYE, District Judge.

138

JOHNSEN, Circuit Judge.

Coppock, as plaintiff, sued Castor and Holland Furnace Company, as defendants, to recover a compensation balance alleged to be due him, on an oral contract, for services performed during 1949 and 1950. A jury returned a verdict in favor of the Company, but against Castor for $18,972.53 and interest. Castor has appealed.

Castor was Branch Manager for Holland Furnace Company at St. Louis, Missouri. His first contention here is that Coppock's contract was one which he had made as agent for the Company, in that Coppock's services were to be performed in the Company's business, and that Castor therefore legally was without personal liability.

■ But, recognizedly, an agent may have a personal liability upon a contract made for his principal, if he so obligates himself and thus becomes a party to the agreement. Restatement, Agency, § 146; Padley v. Catterlin, 64 Mo.App. 629; Meyers v. Kilgen, 177 Mo.App. 724, 160 S.W. 569.

■ The evidence in the record amply warranted the jury in finding that Castor had sought to induce Coppock to become assistant to him, in his capacity of Branch Manager at St. Louis, and that, in order to get Coppock to do so, he had agreed to pay Coppock 25 per cent of such amount as would be coming to him for the calendar year, under his Branch Manager's contract, with Coppock to have a drawing-account allowance from the Company of $100 per week,[1] and with whatever Coppock thus drew to be deducted from the amount which ultimately was to be paid him by Castor.

Castor's contract with the Company provided for the payment to him, as Branch Manager, of the amount of the "Retail Net Profit in the 'Branch Account'," from each year's business. Retail Net Profit was defined in the contract as "the difference between Standard Branch Prices [of the Company's furnaces, parts and materials] and Retail Sales Prices less all expenses and charges plus credits applicable to the branch in accordance with the Branch Account Schedule or any supplement thereto."

Neither party claims that Castor's contract with the Company was in any way attempted to be modified, so as to require or to permit the Company to make payment of 25 per cent, or any other part, of the Retail Net Profit of the Branch, to Coppock instead of Castor. In this situation, if Coppock was to receive a part of the Retail Net Profit, which the Company owed Castor, it was wholly natural, and indeed necessary, that Castor should agree personally to make the payment, as Coppock claimed that he had done.

But Castor's next contention is that whatever personal obligation he might thus ordinarily be regarded as having incurred to Coppock could not in the present situation be held to constitute a contract, because the evidence established that there had been no meeting of the minds between him and Coppock on how "the 25% was to be calculated." This contention also is without merit.

Coppock's testimony was that Castor had said, "I will give you 25 per cent of my earnings." He further showed that he was familiar with what the earnings or compensation of a Branch Manager consisted of under the Company's contracts, and that Castor obviously was aware of this fact in their dealings, because Coppock was, at the very time that Castor sought to induce him to come to St. Louis, holding the position of Branch Manager for the Company at Peoria, Illinois.

The effect of Castor's argument here is that he had meant that Coppock's percentage should apply only to whatever balance would be owing to him from the Company for the year, after deduction of such cash amounts as he might see fit

<hr>

1. The amount of the drawing-account allowance was later increased to $150 per week.

to draw throughout the year, and that, if it could be said that Coppock reasonably had failed to so understand, then there had been no meeting of the minds between them on this essential element, and hence there was no contract.

But this is a false simplification of the question of meeting of the minds in contract dealings. While the situation here is one of oral and not written agreement, the general standard of interpretation to be applied to it nevertheless is that "words or other manifestations of intention forming an agreement, or having reference to the formation of an agreement, are given the meaning which the party making the manifestations should reasonably expect that the other party would give to them." Restatement, Contracts, § 233.

Even if it could be said that Castor's manifestations of intention were ambiguous, so that their interpretation reasonably might be the subject of dispute, this fact alone would not permit it to be held that the oral agreement legally had been without a meeting of the minds. Koelling v. Bank of Sullivan, Mo.App., 220 S.W.2d 794. The court was not entitled to declare as a matter of law that there had been no meeting of the minds, unless the expressions, circumstances and other manifestations of intention in the oral situation were devoid of any natural basis for Coppock to think that Castor had meant what Coppock says he assumed, or for Castor to think, if he had undertaken to do so, that Coppock might so assume. Restatement, supra, id.

No such situation of manifestations was presented by the evidence. For the court to have so declared would have been to ignore the testimony of Coppock that what Castor had said was, "I will give you 25 per cent of my earnings;" that Castor had not in any way indicated that he meant the term "earnings" to apply only to such balance of Retail Net

Profit as would remain, after he had made whatever drawings of cash against it that he might intermediately choose; that, as a matter of fact, Castor had stated, when Coppock made request for a drawing-account allowance, that this would have to be held to $100 a week, because Castor himself did not make any such cash drawings during the year; and that the fact was that Castor had commenced to make drawings of cash against the Retail Net Profit only after Coppock had entered upon his employment at the St. Louis Branch.

It was, of course, for the jury to determine whether these were or were not the facts of the situation. But if the jury found that they were, then clearly it had a right to say, on the basis of them, that Castor could reasonably have expected that Coppock would give them the meaning that he did, and that Castor should accordingly be bound by the meaning which they thus had borne.

What has been said sufficiently disposes also of Castor's related contention that the provision for compensation was too indefinite to be capable of being enforced as a contractual obligation.

Castor further contends that it was error for the court to admit two exhibits—one for each of the years involved—which purported to show his "Total Earnings" as Branch Manager. The exhibits consisted of statements prepared and produced by Castor and Holland Furnace Company, in response to a court order requiring "A statement or statements showing in detail the total amount as determined to date, earned by the respective managers of the St. Louis, Missouri, East St. Louis, Illinois, and Edwardsville, Illinois branch offices [2] of the Holland Furnace Company in each of the years 1949 and 1950, together with any amounts charged to and deducted from the earnings or compensation of the respective managers of those branch offices in 1949

---

**2.** Coppock had initially contended that East St. Louis and Edwardsville were included in Castor's contract. The case was tried and submitted to the jury, however, on the basis of the St. Louis office only.

or 1950 resulting from matters which occurred in 1948 or prior years,[3] and also in the year 1951 to date."

After the furnishing of the statements, Coppock requested a specific admission from Castor "That C. H. Castor as manager of the St. Louis, Missouri, branch of defendant Holland Furnace Company earned in [the year covered by the statement] and there was paid or credited to him by defendant Holland Furnace Company [the amount shown on the statement as 'Total Earnings']." Castor made such an admission in writing.

On the basis of the requirement of the court's order, the purported compliance therewith, the request for admission, and the admission made, Castor would hardly, without proof of error or other inaccuracy having occurred in the preparation of the statement, be in a position to argue that the exhibits were not entirely clear and so might mislead a jury. But beyond this, his contention of error in the admission of the exhibits is in any event without foundation, for the argument made goes at most only to the question of the weight of the figures set out in the statements to persuade a jury, and not to the right to allow them to be received as admissions on the part of Castor himself of the amount of his earnings as manager of the St. Louis Branch for the years involved.

■ Equally without substance, is Castor's final contention, that the court erred in instructing the jury that, if they found the facts to be as Coppock claimed—with the claimed facts being set out in the instruction—then they should return a verdict in favor of Coppock "for 25 per cent of the amount earned by Castor as manager of the St. Louis Branch Office," for each of the years involved, less such amounts as Coppock had drawn.

It is argued that the expression "amount earned" is equivocal and could be confusing to the jury, and that the court therefore ought to have clearly informed the jury "what was meant by the expression 'amount earned'." But if the jury found the facts and terms of the agreement to be as Coppock claimed—which it did—we are unable to see how it could possibly have any difficulty in understanding just what the term "amount earned" meant as related to Coppock's theory of recovery—any more than Castor apparently had any difficulty in understanding what the term meant in complying with the court's order to provide Coppock with such a statement.

Affirmed, with allowance to appellee of the cost of the supplemental record printed by him.

---

3. Charge-backs were made against the current Branch Account on any previous year's business on which adjustments, etc. subsequently arose.