**In re the Marriage of Ruth B. GALLOWAY, Appellant,**

**and**

**John K. Galloway, Respondent.**

No. 9928.

Missouri Court of Appeals, Springfield District.

Feb. 7, 1977.

Frieze, Crandall & Crawford, Carthage, for appellant.

James E. Brown, Joplin, for respondent.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

HOGAN, Judge.

This is a dissolution of marriage proceeding. The trial court has dissolved the marriage, set apart the parties' separate property, divided the marital property and granted the appellant (Ruth) a temporary maintenance order. Ruth now appeals upon the grounds that the division of marital property is so unequal and the award of maintenance so inadequate as to amount to an abuse of discretion. Upon the singular facts of the case, we reverse and remand.

Ruth was 66 years of age when she and John were married on February 24, 1973. She was then employed as a secretary in a St. Louis insurance office; she had been so employed with one or another insurance firm for about 29 years. Her annual income was approximately $7,000. Ruth retired when she married John, relying on John's assurance that the two would move to Elsberry "and travel and be married and have a home."

The parties did move to Elsberry, and John purchased a home. Ruth contributed the furnishings and about $1,000—"four social security checks"—to the establishment of this home. At first, Ruth and John seem to have been compatible. As Ruth described their relationship, she and John were never "lovey-dovey", but got along very well. John was "supposed to be retired" but he continued to work. Ruth kept house, cooked meals when John asked, and in counsel's words, "perform[ed] household chores". John had a "heart attack" in July 1973 and while he was in the hospital Ruth wrote letters, made telephone calls and "did everything [John] asked me to do".

After his heart attack in July, John decided to give Ruth an interest in some of his assets. In a pretrial deposition, parts of which were offered on trial, John testified

that his purpose was to provide Ruth "with a definite means of living", and that he intended to provide her with assets when he made the gift. John denied that all the property Ruth claimed as marital property was properly classified as such, but the record supports the trial court's finding that the marital property includes 1) a house and lot worth $25,000 to $28,000, and 2) seven promissory notes in the total amount of $48,508, all made payable to John and Ruth, all secured by deeds of trust.

We do not know, of course, when John and Ruth's marital troubles began, but their marriage deteriorated and the two literally began to fight. On one occasion they started arguing about a chair after they had retired for the evening. John called Ruth "every name under the sun" and Ruth slapped him. Ruth's testimony suggests that John abused her physically on several occasions. On April 2, 1974, Ruth testified, John knocked her down, beat her and "stomped" on her. She was severely injured and was obliged to have her injuries treated by a physician. In May 1974 John suffered another heart attack near an "eating and drinking" place. Ruth was called, went to the eating and drinking place and found John sitting in a car with a group of people. John was intoxicated and attempted to kick Ruth when she offered assistance. We may say, without detailing the proof, that Ruth's evidence tended to show that John's assault upon her had seriously, possibly permanently disabled her.

In connection with her prayer for a maintenance order, Ruth testified that her assets consisted of the household furnishings she brought into the marriage and a savings account in the amount of $3,200, which she was keeping as a "burial account". Her monthly income consists of social security benefits in the amount of $282.50; her estimated living expenses, including continuing medical care, come to $600 per month. Her testimony was that she could not find employment because of her advanced age—68 —and because she was in poor health. Ruth's evidence bearing upon John's means

was rather indefinite because she had paid little attention to his business, but she indicated that John had, in addition to his interest in the marital property, 1) an interest in a 300–360-acre farm in or near Elsberry; 2) $24,000 in bonds (one of which may have been cashed) and 3) an annual income in excess of $30,000. Ruth makes no claim to any interest in any of these assets.

After Ruth had offered evidence, the court announced to the parties and counsel that "based upon the evidence which the Court has heard so far", it was inclined to award all the marital property, including the real estate and promissory notes and part of the household furnishings (fixtures bought after the marriage) to John. Ruth would receive the household furnishings she had brought into the marriage. Ruth would be granted a maintenance order in the amount of $100 per week until March 1, 1975 (about 3½ months) and thereafter in the sum of $150 per month, to terminate on September 1, 1975. Being so advised, John declined to present any evidence. The court thereupon volunteered this statement (our emphasis):

> "Let me say this, gentlemen, if this lady's got a claim for personal injury based upon an assault, this Court is not in a position at this time of adjudicating that matter *and if she's got some claim for personal injury as a result of assault, why she's got recourse through the Courts for that.* The only thing I am here to do is to grant her what maintenance I feel she is entitled to based upon being married to this man for a little over a year . . ."

 We reiterate the views of this court recently expressed in *In re Marriage of Schulte,* 546 S.W.2d 41 (Mo.App.1976); in marriage dissolution cases, the trial court is vested with broad discretion in dividing marital property and granting maintenance orders, and an appellate court should not interfere unless an abuse of judicial discretion appears. And, of course, our review is limited in this bench-tried case. Rule 73.-01(3), V.A.M.R.; *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

**196**

Nevertheless, as held in *Murphy v. Carron*, supra, 536 S.W.2d at 32, the decree or order in a court-tried case merits *no* deference when it appears the trial court has erroneously declared or applied the law. If it appeared here that the trial court's judgment was based on its opportunity to see and observe live witnesses, and its opportunity to assess their credibility in light of their demeanor and its observation, the judgment would require deference on our part, but it does not appear on this record that the court chose to disbelieve Ruth's evidence. To the contrary, it appears that the court regarded John's assault upon Ruth not as "conduct" to be weighed and considered in rendering this judgment, but as the basis of an independent action. With deference, we believe the trial court erroneously declared and applied the law. Since its decision in *Rogers v. Rogers*, 265 Mo. 200, 177 S.W. 382 (1915), our Supreme Court has consistently adhered to the doctrine of interspousal immunity in cases involving personal torts. *Klein v. Abramson*, 513 S.W.2d 714, 717[3] (Mo.App.1974). That immunity survives divorce. *Ebel v. Ferguson*, 478 S.W.2d 334 (Mo. banc 1972). In our opinion John's assault upon his wife shortly before she left him was "conduct" to be considered in dividing marital property and in deciding whether to award maintenance.

We are in no position to render judgment here on the fragmentary record presented. It appears that there was considerable marital property, and that John had means to pay maintenance. On the other hand, John's health is poor, and we do not know the extent of his debts. It does clearly appear that the trial court erroneously declared and applied the law. Solely for that reason, we reverse the judgment and remand the cause for further hearing.

All concur.