**STRUCTURAL SYSTEMS, INC.,**
**Respondent,**

v.

**Daniel J. HEREFORD, Josephine N. Hereford, d/b/a St. Louis Indoor Tennis Club, Appellants.**

**No. 37607.**

Missouri Court of Appeals,
St. Louis District,
Division Four.

March 14, 1978.

Armstrong, Teasdale, Kramer & Vaughan, Frank N. Gundlach, Edwin L. Noel, St. Louis, for appellants.

Maniscalo, Clancy, Pittman & Bagot, George D. Pittman, Jr., Clayton, for respondent.

PER CURIAM.

After a previous opinion was handed down in this case a rehearing was granted. The case was then reargued before a panel of which two of the three members were not on the panel to which the case was first submitted. Substantial portions of this opinion have been taken directly from the previous opinion.

Plaintiff contracted to build an indoor tennis facility for defendants, but because they contended that the building was not constructed in a workmanlike manner defendants refused to pay the balance of $14,402.69 remaining due on the contract price. Plaintiff filed this action to enforce a mechanic's lien, and defendants filed a counterclaim in two counts. Defendants alleged in the first count that plaintiff did not construct the facility in a workmanlike manner, and they listed seven alleged deficiencies. The second count was based on an alleged breach of an implied warranty that the building would be "fit for use as an indoor tennis club." In their brief defendants-appellants state that although the testimony pertained to other features, "their dissatisfaction with [plaintiff's] work involves the east or upward most portion of the building for it is this side of the building that caused the immense water damage that is the basis of [their] defense to the mechanic's lien action and [the basis for the] counterclaims herein." A jury was waived. The trial court entered judgment in favor of plaintiff and against defendants on each count of the counterclaim. It is from this judgment that defendants have appealed. We affirm.

Respondent contracted to construct, according to plans and specifications approved by appellants, a building on land appellants had recently acquired from respondent which was to house four tennis courts and contain a pro-shop, a locker room and an office.

The lot on which the building was to be placed was not level, but respondent created a level area by excavating about six feet on the east side. This resulted in a rather steep embankment about six or seven feet in height between the building and the eastern boundary of the lot, which boundary was only eleven feet from the building.

Appellants, and not respondent, were to construct the tennis courts, and the work on the four courts was completed, and play was commenced, about four months before respondent completed the building. During this time, several rains occurred and surface water ran down the embankment and eroded dirt which was deposited against the foundation wall of the building. When that deposit reached the level of the top of the foundation wall, the water then ran over the top of the wall and under the metal siding into the building. There is no contention that the construction of the wall was defective in permitting this to occur. Apparently because of this accumulation and because of inadequate drainage, water also seeped through cracks in the foundation and into the building.

In an attempt to correct the problem appellants later changed the conduits constructed by respondent to dispose of the water from the roof of the building, and also built an asphalt trench next to the building to carry away the water. There was evidence, however, that the asphalt was too near the top of the foundation wall and that the trench did not have sufficient slope to carry away the volume of water from the roof and the embankment. A short time before trial appellants constructed a wall of railroad ties near the property line and made what appears to be a wide concrete drainage ditch along the east side of the building. According to appellants this corrected the problem.

Respondent admits that "there is no question but that a substantial amount of water got onto the indoor tennis courts." Appellants contend that the "water damage resulted from the failure to finish grade the east side of the property and the failure to excavate properly the area adjacent to the

east wall of the building." It thus appears that the crucial issue is which party was responsible to do whatever was necessary to the area immediately adjacent to the east side of the building to prevent the entrance of the surface water into the building.

The trial court found that "the water damage sustained by defendants resulted from defendants' failure to finish grading [finish grade?] the east side of defendants' property, the failure of defendants to properly excavate the area adjacent to the east wall of defendants' building, the placing of asphalt in close proximity to the top of the foundation of the east wall of defendants' building and the removal of the horizontal gutters from the east side of defendants' building, all of which permitted water to flow over the top of the foundation to cause the water damage sustained by defendants."

Upon review of this court-tried case "the * * * judgment of the trial court will be sustained * * * unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). It is further stated that "appellate courts should exercise the power to set aside a decree or judgment on the ground that is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."

As is most always true with the typical construction contract, it is difficult to determine its precise terms. We find no single instrument signed by the parties purporting to set forth directly or by reference all the terms of the agreement.

Several documents were introduced in evidence on the basis that they set forth terms of the agreement or constituted evidence of the intention of the parties. We shall review their material parts. A letter dated February 28, 1968 from respondent to Mr. Hereford, one of the appellants, contains an "outline of the Design Criteria and Scope of Work" proposed to be done by respondent. Under "Scope of Work" there

were twenty-one items, general in nature, such as "Grading for Building," "Excavation and Backfilling," and "Masonry Walls and Partitions." The letter also included a paragraph entitled "Items Not Included" which listed "Site Grading for Parking," "Paving," "Landscaping," and "Any items not mentioned in * * * Scope of Work." There was no explanation of these items.

Another exhibit is an "Agreement for Purchase of Land" dated March 21, 1968. It provides for the purchase by appellants from respondent of the land upon which the tennis facility was to be built. It contains several provisions imposing obligations on the parties, three of which we shall mention. The first provides that the seller (respondent) "agrees to grade and level said Lot # 6 in accordance with its development plan, * * *." The second provides that the purchaser (appellants) agrees to enter into a contract to employ respondent to build a tennis facility "as developed on preliminary drawings and as described in attached letter hereto." This refers to the previously mentioned letter dated February 28, 1968. The third is as follows: "Purchaser also agrees to develop all areas in Lot # 6 that are not occupied by the building, the paving, the streets or Shady Creek Channel, into grass and shrubbery, and maintain these areas in good order."

There is also a document entitled "Specifications For Indoor Tennis Court." It contains many provisions. Appellants rely primarily on three of them to support their position that respondent had the contractual obligation to take such steps as were necessary to prevent the surface water damage which occurred. In that part entitled "Specifications For Materials and Labor to be used and employed in the erection and completion" of the building, under the subhead "Supplementary General Condition," there are listed "Additional Conditions, Amendments and Omissions to the A.I.A. [American Institute of Architects] General Conditions" which, it is stated, are to "take precidency only over the articles or portions of A.I.A. General Conditions that are in conflict." In their brief appellants

point to Item B–5 of these "additional conditions," entitled "Grades, Lines and Levels," which provides that "the contractor will establish and maintain all grades, lines, and levels required in the *construction of building*." (Emphasis added.) They do not point out what article or portion of the A.I.A. general conditions Item B–5 is supposed to be in conflict with, or how in the "construction of building" respondent was required to do more than it did to the embankment and the area to the east of the building.

Section 1 of the Specifications, entitled "Excavation," under the subhead "Scope of Work," provides that "The work to be done under this section of the Specifications includes all labor, material, tools and equipment and all operations necessary for or incidental to the completion of all earthwork, including excavation, filling and backfilling, grading, drilling and blasting and all other work necessary *as shown on the plans* and/or *called for in the Specifications*." (Emphasis added.) In this same section, but under the subhead of "Grading," it is further provided that the contractor "shall cut, fill and grade as required for all roads, walks, parking areas, truck approaches, and finish grade the entire property as indicated *on the drawings*." (Emphasis added.) The reference to the "entire property" must be read in connection with the provision in the contract for the purchase of the land that appellants were to "develop all areas not occupied by the building, the paving, the streets * * * into grass and shrubbery * * *," and the letter dated February 28, 1968, that work for which respondent was not responsible included "Site Grading for Parking," "Paving," and "Landscaping."

There was also introduced in evidence an exhibit consisting of ten large sheets containing detailed drawings. Appellants place considerable reliance on pages AA and A–2 of this exhibit. Page AA is a sketch showing the location of the building on the lot, and it shows an "asphaltic concrete" area on the west side with parking spaces. The area on the east side is labeled

"Grass Area." Appellants argue that "The inclusion of this term must mean that respondent agreed to make this a 'grass area,' otherwise there would be no need to include this in respondent's plans." If this were true it would logically follow that by placing the term "asphaltic concrete" on the west side and by showing the parking spaces, respondent was to construct the parking area and pave it. But, as noted, the letter dated February 28, 1968 specifically excludes from respondent's contractual obligations "Site Grading for Parking," "Paving" and "Landscaping." Page A–2 is labeled "Elevations," and at two places there is a term "Finished Grade," of which further mention is made below. Without some other explanation we assume this refers to the grade that is to exist when the project is "Finished." There is no indication on page A–2 as to who shall do the work, and as previously noted, other provisions expressly provide that grading shall be done by both parties to the contract.

Appellants' expert witness, a contractor with extensive experience, testified that in construction projects of this nature there are two types of grading; final or rough grading and finished grading. Rough or final grading consists of moving the dirt to "where the final grade will be." He was asked if he previously had had contracts where the owner wanted to exclude "all final [finish?] grade, exterior landscaping and development from the contract," and he replied "Yes." He then testified that "In situations like that, usually the contractor does what is called rough grading and the finish grading is part of the owner's responsibility." We note here, as previously set out, that in the Specifications (Exhibit No. 4) under the subhead of "Grading" it is provided that the contractor (respondent) shall "finish grade the entire property as indicated on the drawings." We assume the term "drawings" refers to Exhibit No. 20, the ten large sheets. No place on those sheets do we find the term "finish grading." As mentioned above we do find on page A–2 two references to "Finished Grade" and in each case the term refers to a line showing the contour of the final grade of the land. The references cannot be to the act of "finish grading" because one of the references is to the west side of the building where there is no question but that respondent had no responsibility to do any more than the rough grading. In addition, Exhibit 2 contains general provisions and must be construed with provisions in other instruments, and in determining the meaning we must consider the generally accepted practice in the industry as testified to by appellants' expert witness. Respondent's obligation to do "finish grading" pursuant to Exhibit No. 4 is specifically limited to those areas shown on the "drawings," and we there find no such area.

Appellants argue that the terms of the agreement are to be construed strictly against the party who prepared it. See *John Deere Company v. Hensley*, 527 S.W.2d 363 (Mo. banc 1975). We accept this principle, but we are to determine the intention of the parties as evidenced by the language used, *Ward v. Gregory*, 305 S.W.2d 499 (Mo.App.1957), and in making that determination we are to consider the surrounding circumstances and conditions. *McIntyre v. McIntyre*, 377 S.W.2d 421 (Mo. 1964). When there is more than one instrument, as here, we must construe them together, *Elliott v. Richter*, 496 S.W.2d 860 (Mo.1973), and contradictions must be harmonized if reasonably possible. *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261 (Mo. banc 1973). We do not find actual contradictions as much as we find it necessary to dovetail the various provisions into a single contractual obligation on the part of respondent, and in doing so we fail to find any contractual obligation on respondent to perform any more work on the east side of the building than it did. In the absence of contractual duty, it was the responsibility of appellants to protect their own property.

Appellants' remaining two points are that the trial court erred in (a) not finding that respondent breached its implied warranty to design and construct a building reasonably fit for use as a tennis club, and (b) in finding for respondent "on its petition to

enforce mechanic's lien" because respondent "failed to perform in a workmanlike manner."

The trial court found that the work was done in a workmanlike manner because it granted a mechanic's lien against the property subject to a deed of trust. These last two points are premised on the fact that the area east of the building was not finish graded by respondent, and that because of that failure damage from surface water resulted. We have ruled that respondent had no duty under the contract to perform that work east of the building.

We find substantial evidence to support the judgment of the trial court and that it is not against the weight of the evidence. We also find that the trial court did not erroneously declare the applicable law.

The judgment is affirmed.