Norman L. ROUGGLY and Stella Rouggly, His Wife, Respondents,

v.

Harold WHITMAN, Appellant.

No. 40936.

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 11, 1979.

Clinton Almond, Hillsboro, for appellant.

John A. Schneider, Richeson, Roberts, Wegmann, Gasaway, Stewart & Schneider, Hillsboro, for respondents.

PER CURIAM.

This litigation springs from a disagreement over the effect of certain terms contained in a purchase money note taken by plaintiff-respondent (Seller) together with a deed of trust upon defendant-appellant's (Buyer) purchase of a large tract of land situated predominately in Jefferson County, Missouri. After making payments on the note for several years without incident, the Buyer concluded that under his interpretation of the disputed language he had satisfied his obligation in full. The Seller did

not concur in Buyer's reading of the note, and this suit to enforce Seller's version of its terms ensued. From the resultant adverse judgment, Buyer appeals.

The following narrative is drawn from evidence adduced at trial that was essentially undisputed.

The land in question, slightly less than 300 acres, was inherited by Seller Norman Rouggly from his father, who had constructed a lake upon and partially platted the property. Mr. Rouggly, who had little or no experience in real estate development, decided in 1969 to sell the property and contacted a realtor who listed it for sale at $50,000. Buyer Harold Whitman, an experienced developer of similar lake properties, became interested in the property and offered to pay the full purchase price of $50,-000 in cash. Seller, in order to secure a more favorable tax treatment of the transaction, countered with a proposal that Buyer pay $14,000 down and extend payment of the balance over a period of years. The Buyer accepted. The sale documents, including the note in question here, were somewhat inartfully prepared by Seller's realtor, who was not a lawyer. The note provided in pertinent part as follows:

De Soto, Missouri October 15, 1969
$36,000.00

For value received I promise to pay to the order of NORMAN L. ROUGGLY and STELLA ROUGGLY, his wife THIRTY–SIX THOUSAND————— DOLLARS with interest from date at the rate of 6½ per cent per annum, payable as follows: $1,500.00 plus accrued interest on April 15, 1970, October 15, 1970, April 15, 1971 and October 15, 1971, and the sum of $2,000.00 plus accrued interest on April 15, 1972 and every six (6) months thereafter until the entire sum shall have been paid. Grantor agrees that there will be at least two (2) lots subdivided or platted within each acre of the land described in the accompanying Deed of Trust which is not now platted or subdivided land. *Subject to this agreement Grantee agrees to release by partial release any of the above lots already plat-ted or any of the lots to be platted upon an additional payment of $200.00 for each such lot released.*

\* \* \* \* \* \*

We further agree to pay all costs and attorney's fees should this note be placed in the hands of an Attorney for collection. Prepayment of note reserved by maker at any time, without penalty.

/S/————————————
Harold Whitman

(Emphasis added)

The emphasized language was included at Buyer's behest. Its purpose was to enable him to in turn convey clear title to any individual lots sold by him before full payment of the note and consequent release of the deed of trust on the entire development. The language allowing prepayment of principal without penalty was also included at Buyer's urging.

The transaction closed as planned and Buyer began making payments as scheduled in the note. The payments continued as scheduled until April of 1976, at which time the Buyer had also paid to Seller $15,200 in individual lot release payments of $200 each for lots he had in turn sold to third party purchasers. Buyer's accountant at that time drew attention to the fact that the note had been "overpaid" in that a total of $37,200 had been paid when lot release payments were added to amounts paid as scheduled on the note. The Buyer ceased making payments.

After being notified by Buyer that the note was paid in full, Seller demanded that the scheduled payments continue, claiming that the $200 lot release payments were not intended to count against the principal due on the note. On Buyer's refusal, Seller accelerated the note and brought this action to recover the balance and for a declaratory judgment to the effect that the $200 release payments were additional to and not deductible from the face amount of the note. Buyer counterclaimed for a reformation of the note reflecting his version of the "additional payment of $200.00" language, for a

declaratory judgment affirming that the word "additional" was referable to regularly scheduled payments rather than to total principal, and for specific performance of Seller's obligation to release the deed of trust on the property. The counterclaim also included a count for refund of the amount overpaid and for damages due to lost business.

The trial court found that no ambiguity existed in the note's language, and that the word "additional", being referable only to the outstanding principal balance, precluded deduction of the $200 payments from amounts due under the note. Judgment was entered for Seller for the balance due plus interest and attorney's fees and against Buyer on his counterclaims.

For the reasons which follow, we reverse and remand.

■ The customary standards of appellate review enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), are applicable. While considerable deference is to be accorded judgments turning on evidentiary and factual evaluations by the trial court under *Murphy v. Carron*, no such deferential consideration obtains in cases decided upon erroneous declarations or applications of the law. *In re Marriage of Galloway*, 547 S.W.2d 193, 196 (Mo.App. 1977).

■ Whether ambiguity exists in the terms of a contract is a question of law for resolution by the court in the first instance, prior to any factual determination as to the meaning of such ambiguous language. *Motor Carriers Council of St. Louis, Inc. v. Local Union No. 600*, 486 F.2d 650 (8th Cir. 1973); *O'Brien v. Missouri Cities Water Co.*, 574 S.W.2d 13 (Mo.App.1978).

A contract is ambiguous only when it is reasonably susceptible of different constructions. In determining whether or not there is such an ambiguity as calls for construction, the whole instrument must be considered. *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973).

■ In this case, an examination of the entire instrument affords few clues as to whether the words "additional payment" are referable to outstanding principal or to the periodic installment payments. More specifically, it is not clear within the context of the document whether each $200 payment is to be considered additional only to the specified periodic installments and hence deductible from the outstanding principal balance, or whether each such payment is to be additional to and therefore wholly independent of that balance. The note is clearly "reasonably susceptible of different constructions" and, hence, ambiguous. The trial court's conclusion to the contrary is therefore an erroneous declaration and application of the law.

■ If, as the trial court concluded, there were no ambiguities in the note's terms, the intentions of the parties are to be ascertained by the court as a question of law within the four corners of that document and it alone. *Thurman v. K. L. Koenig Realty Co.*, 423 S.W.2d 196, 200 (Mo. App.1967). The document was before the court. The court's conclusion that it contained no ambiguity rendered any resolution of factual issues based on the court's assessment and evaluation of witness testimony unnecessary to its disposition of the case. Thus, the more expansive scope of review applicable to judgments erroneously declaring or applying the law under *Murphy v. Carron* governs here. *In re Marriage of Galloway*. Accordingly, we will review the entire record of the proceedings below, and, if the evidence is sufficient to enable us to do so, enter such judgment as should have been entered below. *City-Wide Asphalt Co. v. City of Independence*, 546 S.W.2d 493, 498 (Mo.App.1976).

■ To aid in construing ambiguous contracts, courts may consider "the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances which cast light on the intent of the

parties." *Grantham v. Rockhurst University*, 563 S.W.2d 147, 150 (Mo.App.1978).

Considering the language of "the entire contract", we are struck by the prefatory clause "Subject to this agreement . .", that qualifies the entire $200.00 additional payment provision. The intendment of the words "subject to . . ." seems to be that any such payments are subordinate to the primary undertaking of the note, i. e., the expressed promise to ultimately pay only a total of $36,000.00 plus specified interest. Had the scrivener meant to give effect to a different understanding of the parties, i. e., that all such payments were *additional* to the $36,000 primary obligation, it is more likely that language connoting "*independent* of" or "*separate* from this agreement" would have been utilized prefatorily. We have already recognized that the note is inelegantly drawn.

The presence of the provision allowing prepayment of the note without penalty also supports the Buyer's position. Both parties essentially admitted in their testimony that Buyer offered to pay the purchase price in cash, but that Seller preferred installment payments for tax reasons. Buyer testified that the prepayment without penalty provision, seemingly contradicting the mutual understanding as to installment payments, was inserted only to allow him to make the $200.00 release payments against principal without penalty. Under the Buyer's argument, the agreement of the parties as to payment of the remaining purchase price over a period of time was not to be circumvented. Although the note would have been paid off prior to expiration of the payment schedule, the determining factor as to the timing of full satisfaction would be the speed with which individual lots were resold and released. Seller argues that the intent of the parties in including the prepayment language was to allow Buyer to avoid having to pay any $200.00 additional payments at all simply by paying the note off at once and thereby securing an immediate release of the deed of trust. This simply does not comport with the testimony of both parties that deferred payment of the purchase price was intended because Seller wished to avoid a lump-sum payment. It is difficult to understand why Seller would refuse to accept full cash payment and then bother negotiating and establishing time payments and procedures, only to immediately give Buyer both a motive (avoid extra $200.00 release payments) and the means to circumvent the installment agreement. The presence of the prepayment without penalty provision makes sense only when read *in pari materia* with Buyer's version of the release payment clause.

In referring to the "subject matter of the contract" as an aid in construction, Buyer argues that the custom and usage of the real estate development and financing industry is that such partial release payments are uniformly applied by commercial lenders against outstanding principal. The evidence shows, however, that Seller was inexperienced in real estate transactions. The Buyer has not made the necessary showing that the Seller knew or had reason to know of the Buyer's intention that the release payment provision be governed by the applicable custom and usage, and that usage should not be operative against the Seller. *State ex rel. H. K. Porter Co. v. Nangle*, 405 S.W.2d 501, 504 (Mo.App.1966). It is not necessary to decide whether the Seller might be chargeable with his real estate agent's knowledge of this custom and usage on an agency theory, inasmuch as the realtor did not appear at the trial. No evidence was adduced on the issue of the realtor's experience or knowledge of the usage.

The "facts and circumstances surrounding the execution of the contract" are, perhaps, the most revealing aids to its construction. It is clear that the provision in question was proposed by and included at Buyer's behest. It is equally manifest from the testimony of the parties that the purpose of the provision was to enable Buyer to resell individual lots before satisfaction and release of the note and deed of trust in full, while simultaneously protecting Seller against premature erosion of his security for the payment of the note. The mechanism by which this latter purpose is accom-

plished is that Seller is protected by these payments from the possibility that all the most valuable lots would be resold and released long before maturity of the note, which would leave him with impaired security inadequate to assure payment or recovery of the outstanding balance in the event of default.

As an illustration, the property in question could have been platted into a minimum total of 600 lots (the note restricts lot size to no less than 2 lots per acre × 300 acres). Had 180 lots been released prior to any scheduled payments under the note, Seller would have realized an amount equal to the face value of the note at a time when less than one-third of the land had been resold, regardless of whether the release payments are viewed as deductible from the principal outstanding.

▇ Thus, the Seller is fully protected under either version of the disputed language, although he would reap considerably greater benefits under the construction he urges. This highlights one of the logical inconsistencies of the position Seller has taken on the matter. Seller admitted that the agreed purchase price had always been $50,000, and further that he never expected any extra sums until the time of the signing of the sale contract. He thus urges that the parties did not merely intend adequate protection of Seller's security under the note by the requirement of a $200 principal prepayment per lot released, but that the Buyer went even further and gratuitously (but inexplicably) volunteered to make extensive additional payments not counting against his obligation and which could conceivably amount to several times the agreed purchase price of the land—this entirely on Buyer's own motion and with no demand or request by Seller. Such unprompted magnanimity is neither the way of the market place nor characteristic of human nature. The sheer implausibility of such a turn of events begs belief.

Where a contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally make, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable contract. *Miller v. Kamo Electric Cooperative, Inc.,* 351 S.W.2d 38, 42 (Mo.App. 1961), citing *Big Muddy Coal & Iron Co. v. St. Louis-Centerville Coal Co.,* 176 Mo. App. 407, 158 S.W. 420 (1913).

The more probable and reasonable of two available constructions should be utilized to the exclusion of one which produces a "redundant, illusory, absurd, and therefore unreasonable" result. *Standard Meat Co. v. Taco Kid of Springfield, Inc.,* 554 S.W.2d 592, 596 (Mo.App.1977). Such guidelines requiring a "reasonable" construction are founded on sound legal principles:

"[W]ords or other manifestations of intention forming an agreement, or having reference to the formation of an agreement, are given the meaning which the party making the manifestations should reasonably expect that the other party would give to them." *Castor v. Coppock,* 211 F.2d 136, 139 (8th Cir. 1954), citing Rest., Contracts, § 233.

Buyer had the right to "reasonably expect" Seller to understand that by inclusion of this language he was not unilaterally volunteering to pay virtually unlimited sums of money over and above the agreed purchase price with no expectation of return thereon. This is so particularly where Seller was more than adequately protected against impairment of his security under the construction urged by Buyer. If Seller is to be held to a standard of "reasonable expectation", Buyer's version of the disputed language must prevail.

Other circumstances surrounding the execution of the contract that propel us inexorably to the same conclusion include the course of negotiations as testified to by the parties. By Seller's own admission, the agreed purchase price had at all times been $50,000.00. There was no evidence that any additional sums had ever been requested or demanded by him. Seller testified that he

first became aware of the extra $200.00 payments he was to receive when the parties met to sign the sale contract. If the extra $200.00 payments were not contemplated as part of the purchase price (Seller having admitted that the full price was in fact the $50,000.00 encompassed by the $14,000.00 down payment and $36,000.00 note, and no more), there is no indication in the evidence as to what those payments were otherwise intended to represent or accomplish. Testimony as to the negotiations leading to and surrounding the execution of the sale agreement discloses no evidence that any other agreements were contemplated. If Seller's version is correct, these $200.00 payments exist in an evidentiary vacuum as to their intended purpose.

To buttress his position, Seller testified to the effect that, following the signing of the sale contract, Buyer "admitted" to him that he (Seller) could expect to realize more from the $200.00 lot release payments than from the note proceeds:

Q. Did Mr. Whitman make any remarks about receipt of money from the additional payments at that time [following signing of the contract]?

A. Yes.

Q. What did he say?

A. He said, "Mr. Rouggly, I think you'll realize more out of the deed releases than you will off of the interest as I hope to pay it off early".

The problem with Seller's interpretation of this "admission" is that it is also consistent with the result Buyer argues for—i. e., that the note was likely to be prepaid through release payments before it would be satisfied under the regular installment payment schedule. Even if Seller in good faith thought these words meant otherwise, he must yet be held to a standard of reasonable expectation of the Buyer as to the meaning Seller would accord these words, *Castor v. Coppock*. To believe that Seller was in effect making an unprompted gift of these $200.00 payments by the quoted statement does not measure up to any standard of reasonableness. Further, the statement of anticipated early payoff is not congruent with a substantial number of "additional" deed release payments under Seller's reading, as prepayment would automatically terminate any interest or deed release payment obligations.

We now consider the "practical construction placed on the agreement by the parties through their acts and deeds". The Seller claims that Buyer's admitted failure to deduct the $200.00 payments from principal and adjust interest due accordingly in his own records is fatal to his contention that the release payments were prepayments of principal. This ignores the fact that Buyer did not keep his own records in this regard. Buyer also testified that ordinarily he relied on the lender to make the necessary adjustments to principal and interest in his own records. It is also true that, as is usually the case with commercial lenders when financing such a transaction, Seller prepared the amortization schedule that was to be followed. Finally, both Buyer and his accountant testified that they had intended to make the appropriate adjustments in their records at the end of the transaction—essentially as was in fact done at the time the accountant discovered the note had been paid in full.

Seller, on the other hand, was apparently wholly inconsistent in his treatment of the transaction. He variously testified that he treated the release payments as "extra interest" under the note, then "extra principal", and finally that he listed them as capital gains on his tax returns. However, capital gains treatment would not be consistent with his admission that the "extra" payments were not part of the purchase price of the property. Furthermore, Seller testified that no portion of the $200.00 payments was paid to his realtor, although the realtor would have been entitled to commission thereon if they were in fact capital gains and part of some "additional" purchase price.

Seller also presented some testimony to the effect that he took a certain number of days off work for the purpose of executing partial release deeds. Although he never expressly makes the argument, the implica-

tion of this seems to be that the release payments may have been compensation for lost work or his time and efforts in executing the releases. If so, such payments would have been ordinary income, and not properly treated as capital gain. In any event, there was no direct evidence by testimony or otherwise that either of the parties in fact ever contemplated these payments as "compensation" for Seller's efforts in executing the requested releases. In short, the "practical construction" accorded these payments by Seller through his actions was consistent not with a particular coherent reading of the terms of the note, but rather with maximizing his pecuniary advantage depending upon the purpose or context in which the payments are considered. The acts and deeds of the parties are inconclusive as indicia of their intentions or understanding of the disputed terms.

Finally, in considering "other external circumstances" to arrive at a construction of this clause, Seller argues that because Buyer caused its insertion in the contract, it be construed strictly against him. *Structural Systems, Inc. v. Hereford*, 564 S.W.2d 62 (Mo.App.1978). This fails to take into account that Seller was responsible for the preparation of the document through his agent, and that he also claims the benefit of the disputed language as protection for his security. Both factors support a strict reading against the Seller. *Structural Systems, Inc.* However, the rule of construction requiring that ambiguous language be construed against the party responsible for its use is based more on a concept of appropriate allocation of blame for the faulty language than on an attempt to ascertain true intent or meaning. Consequently, this rule is employed only as a last resort when other available data bearing on the agreement shed no light on actual intent or meaning. *Prentice v. Rowe*, 324 S.W.2d 457, 464 (Mo.App.1959). Here, we have no need to resort to such artificial rules of construction. The evidence of the circumstances surrounding the negotiations between the parties and the execution of the note is uniformly and overwhelmingly in favor of the reading urged by the Buy-

er—that the $200.00 payments contemplated at the time of execution of the partial deed releases were to be "additional" only to regularly scheduled installments and not to the outstanding principal balance of the note.

Accordingly, we reverse the judgment entered below in favor of Seller and remand with directions to enter judgment for Buyer on his counterclaim for acknowledgment of satisfaction and release of the note and deed of trust. In light of this disposition, the count of Buyer's counterclaim seeking reformation of the note becomes moot. The additional counts of the counterclaim seeking recovery of the amounts paid to Seller in excess of the note obligation and for damages are deemed abandoned for failure to adduce any probative evidence relating to them.

Reversed and remanded.

All judges concur.