Ronald R. REESE and Deborah H.
Reese, Plaintiffs-Respondents,

v.

FIRST MISSOURI BANK & TRUST
COMPANY OF CREVE COEUR, and
Stephen Hereford, Trustee, Defendants-
Appellants.

No. 46064.

Missouri Court of Appeals,
Eastern District,
Division Five.

July 26, 1983.

Motion for Rehearing/Transfer to
Supreme Court Denied Sept. 15, 1983.

Case Transferred to Supreme Court
Oct. 18, 1983.

Case Retransferred to Court of
Appeals Feb. 1, 1984.

Davis Alan Sosne, Clayton, for defendants-appellants.

Sanford Goffstein, Clayton, for plaintiffs-respondents.

GEORGE M. FLANIGAN, Special Judge.

Plaintiffs Ronald R. Reese and Deborah H. Reese, his wife, brought this action for an injunction restraining defendants from foreclosing under a deed of trust on land on which plaintiffs had built their new home. The two defendants are First Missouri Bank & Trust Company of Creve Coeur, payee and holder of the secured note, and the trustee. On the theory that default had been made in the payment of the note, the bank had requested its co-defendant to advertise the property for sale under the power of sale contained in the deed of trust.

On March 6, 1981, plaintiffs executed the note in the principal amount of $92,300 in favor of the bank as part of a home loan transaction. The primary issue is whether the note was, as the bank claims, a demand note, or whether it was, as plaintiffs claim and the trial court found, an installment note payable monthly over a period of 36 months. Although other provisions of the note will be mentioned later, the root of the controversy is the meaning of the following language contained in the payment schedule of the note: "On demand and if no demand be made then principal & interest is payable in monthly installments of $1,040.96 commencing on April 6, 1981 and on that day of each succeeding month until maturity, March 6, 1984. A final payment in the amount of $91,544.30 due March 6, 1984, plus accrued interest subject to refinance at the option of the bank."

After making requested findings of fact, the trial court enjoined the foreclosure proceedings until March 6, 1984, "at which time the remaining amount due and owing [on the note] becomes due and payable." The injunction was conditioned "on the timely payment of all remaining principal and interest payments" by plaintiffs to the bank in accordance with the monthly installments mentioned in the schedule. Since the inception of the loan plaintiffs have made, and the bank has accepted, monthly payments of $1,040.96. The bank appeals.

Although there were some factual disputes, the following summary is consistent

with the trial court's findings and fully supported by the record. Since the bank does not question the authority of its various representatives, actions taken by them on behalf of the bank will be attributed to the bank itself.

Plaintiff Ronald Reese was employed by the bank from 1974 until September 1980. During the last five years of his employment Reese was a loan officer and handled "50 to 100" purchase-money real estate loans on behalf of the bank. The record does not disclose the reason for Reese's leaving the bank but apparently the parting was amicable because the following dealings between Reese and the bank commenced in October 1980 and culminated with the filing of this action on September 23, 1981. In that interval the following occurred:

October 5—The Reeses, as purchasers, entered into a written agreement with The Jones Company, as seller, for the purchase of a lot on which the seller was to construct a new house for a total sale price of $123,450, $28,450 of which was to be paid upon or prior to completion of the construction, with the balance of $95,000, secured by a deed of trust, to be paid over 30 years at 13 percent interest. With regard to the latter feature, the Reeses were required "to furnish own financing" and to supply the seller with a copy of a loan commitment within 30 days.

October 6—Reese informed the bank of his need for a loan commitment with respect to the Reese-Jones Company agreement. The bank gave the Reeses a commitment letter for a loan of $95,000, reading in part: "Interest rate: 13 percent . . . Term three-year note—25-year amortization—loan service charge: 2 points. . . . Loan to be closed on or before April 7, 1981. . . . Payment in advance of the service charge as a commitment fee." The letter required that it be accepted within 10 days. The Reeses did not accept it.

October 24—The bank gave the Reeses a new commitment letter for a loan of $80,000, reading in part: "Interest rate: 13 percent . . . Term: three-year note—25-year amortization . . . Payable: $902.27 principal and interest payable monthly . . . Loan service charge: 2 percent [$1,600] . . . This commitment must be accepted within 10 days. . . . Loan to be closed on or before May 1, 1981. . . . Payment in advance of the service charge as a commitment fee . . . In the event any payment is received after the 10th day of the month in which the payment is due, a late charge of 4 percent of the total monthly payment is added to the payment due. The note will also provide for the increasing of the interest rate to 15 percent during delinquency." The bank understood that Reese "would give this letter to Mr. Jones, the builder."

November (?) (within 10 days of October 24)—The Reeses accepted the October 24 commitment letter and gave the bank a signed copy of it, together with a $1,600 check in payment of the loan service charge. The bank misplaced the check and the returned copy and the check was never cashed.

January or February—Reese asked the bank why the $1,600 check had not been cashed and was informed it was lost and that he could pay the loan service charge when the loan was closed.

March 6, 1981—The bank and the Reeses agreed to increase the principal of the loan to $92,300. The Reeses paid the bank a loan service charge ("points") of 2 percent of the loan—$1,846. At the loan closing, attended by the Reeses, the bank, and a representative of Jones Company, these documents were executed: promissory note, demand note, deed of trust, and a Federal Truth-in-Lending Statement. Pertinent provisions of those documents are set forth

below.[1] The bank also gave the Reeses a document entitled "Amortization of Extended Mortgage Loan" showing the term of the loan to be 25 years, interest rate of 13 percent, "monthly payment $1,040.96." This document showed the principal and interest components of each monthly payment.

March 8—A loan report with regard to the Reese loan was made by the loan officer to the bank's loan committee. The report described the loan's "repayment program" as "36 months on 25-year amortization," with "maturity date" of "three years." It also showed a "fixed interest rate" of 13 percent. This form bore a comment, "This loan was committed back in October when prime was in the 13–14 percent range." The prime interest rate had risen substantially between October and March.

April 14—The bank sent Reese a letter stating that the board of directors "has

1. Documents executed on March 6, 1981—(Typewritten portions are underlined—other portions printed):

Promissory Note

– $92,300 –

(a) Payable: "On demand and if no demand be made then principal & interest is payable in monthly installments of $1,040.96 commencing on April 6, 1981 and on that day of each succeeding month until maturity, March 6, 1984. A final payment in the amount of $91,544.30 due March 6, 1984 plus accrued interest subject to refinance at the option of the bank."

(b) Unpaid balance shall become due at option of holder if makers fail to make payment of any amount within 10 days after same becomes due and payable or upon happening of any of the events of default or other breach contained in the deed of trust or the demand note.

(c) Makers waive demand for payment and agree to pay attorney's fee of 15 percent if placed with an attorney for collection.

(d) This note is secured by [the demand note] and [the deed of trust].

Deed of Trust

(a) Bears subtitle "Installment payments."

(b) Contains copy of demand note.

(c) "In the event that [the land] should be conveyed [by the Reeses], the principal note secured hereby shall at the option of the holder be immediately due and payable."

(d) Reeses agree to pay taxes and maintain insurance.

(e) When any installment of [the demand note], after becoming due and payable, shall remain unpaid, entire balance of [demand note] shall, at the option of the holder, become due and payable, whether due on its face or not.

(f) If [the Reeses] pay [the bank] the [demand note] and all installments thereof at maturity thereof, and shall perform all agreements herein, this trust shall be void.

(g) If default be made in the agreements, trustee, at the request of the bank, may proceed to sell.

Demand Note

– $92,300 –

(a) On demand [the Reeses] promise to pay to the order of [the bank].

(b) Makers agree if this note "after demand be made" is placed in the hands of an attorney for collection . . . to pay [the bank] 15 percent as attorney's fees.

(c) This note is pledged as security for the payment of loans to be made from time to time at the option of [the bank] to [the Reeses] and does not represent an obligation in addition to the note or notes taken to evidence said loans.

(d) Payment hereunder is conditioned upon default in payment of [the promissory note].

Federal Truth-in-Lending Statement

(a) The total finance charge is $38,211.15, consisting of a "total prepaid finance charge of $1,846" and "interest (simple annual rate of 13 percent) of $36,365.15."

(b) The "amount financed" is $90,454 ($92,300 minus $1,846).

(c) The annual percentage rate on the amount financed is 13.8 percent.

The form requires that an asterisk be used to show a rate which "may be subject to change." No asterisk was used.

(d) If the contract contains a provision for variation in the interest rate, describe – not applicable.

(e) Payable: "On demand and if no demand be made then principal & interest is payable in monthly installments of $1,040.96 commencing on April 6, 1981 and on that day of each succeeding month until maturity, March 6, 1984. A final payment in the amount of $91;544.30 due March 6, 1984 plus accrued interest subject to refinance at the option of the bank."

questioned your $92,300 loan . . . To clarify the bank's position, this loan was to serve as interim financing until you were able to obtain permanent financing . . . The bank will exercise its demand provisions if the loan is not refinanced within six months. We assume you are aware that the October 24 commitment for $80,000 expired on November 3, 1980, since you had neither paid the $1,600 commitment fee or signed your acceptance by that time." A later letter (the April 23 letter) from the bank, to similar effect, did not bear the initials of the secretary who typed it. The secretary testified that she did not initial it because she knew it was false in stating that the $1,600 commitment fee had not been paid and that the acceptance had not been signed by the Reeses.

April 19—Reese wrote a letter to the bank informing them that "the $1,600 commitment fee and the loan commitment letter were returned within the period provided for acceptance."

April 23—The bank, by letter to Reese, stated, "We must request that you make arrangements to move this loan by September 6, 1981, so that it will be unnecessary for us to make demand."

June 26—The bank's attorney, in a letter to the Reeses, made "formal demand" for payment of the "unpaid principal" and "interest" together with attorney's fees of $14,674.81.

August 28—The bank's attorneys mailed to the Reeses a letter, entitled "notice of foreclosure," stating that the trustee would hold a foreclosure sale on September 30.

Of paramount significance is the fact that this is a dispute between the original parties to the loan transaction. For the reasons which follow, this court holds that the parties intended the promissory note set forth in footnote 1 to be an installment note, as the trial court found, and that defendants had no right to institute foreclosure. This conclusion is justified by an analysis of the March 6 documents, construed together as one agreement, in light of the circumstances attending their execution.

With an exception not applicable here, § 400.3–119(1),[2] a statute contained in the Uniform Commercial Code, reads: "As between the obligor and his immediate obligee . . . the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction."

The "Missouri Code Comment" under that statute states that it "clarifies the effect of separate contemporaneous agreements arising out of the same transaction . . ." The Uniform Commercial Code Comment under the statute states, in pertinent part: "[This section] is intended to resolve conflicts as to the effect of a separate writing upon a negotiable instrument.

"1. . . . This section is limited to the effect of a separate written agreement executed as a part of the same transaction. The separate writing is most commonly an agreement creating or providing for a security interest such as a mortgage, . . .

"2. . . .

"3. The section applies to negotiable instruments the ordinary rule that writings executed as a part of the same transaction are to be read together as a single agreement. As between the immediate parties a negotiable instrument is merely a contract, and is no exception to the principle that the courts will look to the entire contract in writing. Accordingly a note may be affected by an acceleration clause, a clause providing for discharge under certain conditions, or any other relevant terms in the separate writing. . . ."

The word "instrument," as used in § 400.3–119(1), means a negotiable instrument. § 400.3–102(e). The requirements for a writing to be a negotiable instrument are set forth in § 400.3–104(1). One of those requirements is that the writing "contained an unconditional promise . . . to pay a sum certain in money." A writing which complies with the requirements of § 400.3–

2. Unless otherwise indicated, all references to statutes are to RSMo 1978, V.A.M.S.

104 is a "note" if it is a promise other than a certificate of deposit. § 400.3–104(2)(d).

Under § 400.3–105 a promise otherwise unconditional is not made conditional by the fact that the instrument refers to a separate agreement for rights as to acceleration, § 400.3–105(1)(c), or by the fact that it states that it is secured by mortgage. § 400.3–105(1)(e). On the other hand, a promise is not unconditional if the instrument states that it is subject to or governed by any other agreement. § 400.3–105(2)(a). So there is authority for the proposition that a note which incorporates the terms of the purchase money mortgage is not negotiable. *Holly Hill Acres, Ltd. v. Charter Bank of Gainesville,* 314 So.2d 209, 211[1] (Fla.App.1975). On reason it would appear that if a note, which qualifies as a negotiable instrument, is vulnerable, as between the original parties, to the terms of other written agreements executed as a part of the same transaction, a non-negotiable instrument would be similarly vulnerable.

Even if the four March 6 documents be viewed in a non-UCC setting, this court, in determining the intent of the parties, considers "the entire instrument, subsidiary agreements between the parties, and external circumstances which cast light on the intent." *Tri-State Gas Co. v. Kansas City Southern Railway Co.,* 484 S.W.2d 252, 254[3] (Mo.1972). "When there is more than one instrument, as here, we must construe them together ... and contradictions must be harmonized if reasonably possible." *Structural Systems, Inc. v. Hereford,* 564 S.W.2d 62, 66 (Mo.App.1978). See also *Local Acceptance Co. v. Kinkade,* 361 S.W.2d 830, 833[3] (Mo. banc 1962).

"Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." § 400.3–108. Referring to that section of the UCC the Oregon Supreme Court said, "The drafters obviously felt no need to state the obvious, that demand instruments also include instruments made expressly payable 'on demand.'" *Seattle-First Nat. Bank v. Schriber,* 282 Or. 625, 580 P.2d 1012, 1013 (1978). With respect to "demand instruments," one authority has said, "As the term applies to the maker of a note, it is somewhat anomalous since no demand need be made by the holder. Instead, his cause of action immediately accrues on the date of the instrument, or if not dated, on the date the maker issues it. The holder usually does make demand, however, since it would be foolish to start a lawsuit if he is in fact going to be paid." Bender's Uniform Commercial Code Service, Commercial Paper, Hart & Willier, Vol. 2, § 5.02[2], p. 5–5. So it is said that a demand note, on issue, is mature and due. *Paine-Erie, Etc. v. Lincoln First Bank of Rochester,* 82 Misc.2d 432, 370 N.Y.S.2d 370 (1975). To similar effect see *Matter of Estate of Culver v. Andres,* 26 Or.App. 809, 554 P.2d 541, 542 (1976). See also § 400.3–122(1)(b). No prior demand need be made in order for a cause of action to accrue on a demand instrument, *Cantonwine v. Fehling,* 582 P.2d 592 (Wy.1978); *Schnug v. Schnug,* 203 Kan. 380, 454 P.2d 474 (1969), and the only duty the UCC places upon the holder of a demand instrument is to seek enforcement of the note within the applicable statute of limitation. *Fulton National Bank v. Willis Denney Ford, Inc.,* 154 Ga.App. 846, 269 S.E.2d 916 (1980).

Only a few reported cases have been found which involved the construction of a note payable "on demand and [or "but"] if no demand is made ... [followed by a schedule of installment payments]," and they seem to reach varying results. The cases are *Exchange Nat. Bank of Chicago v. Crest Finance Co.,* 53 Ill.App.2d 255, 203 N.E.2d 58 (1964); *Conte v. Greater Houston Bank,* 641 S.W.2d 411, 418 (Tex.App.1982); *C & Z, Inc. v. Oklahoma Tax Commission,* 459 P.2d 601 (Okl.1969); *First Nat. Bank v. Bell,* 140 Okl. 24, 282 P. 147 (1929). In the first two cases the note was held to be a demand note and in the latter two cases the note was held not to be a demand note. These authorities are of limited significance here because they did not involve notes which were accompanied by the other documents set forth in footnote 1.

Sec. 400.3–118(b) provides that in construing instruments typewritten terms control printed terms and such is the law even in non-UCC settings. In light of the foregoing principle, some of the provisions of the group of March 6 documents are of equal dignity and, at least to some extent, conflict. Even the bank's witness, attorney Donald Gunn, described the promissory note as a "hybrid type note."

Examination of the March 6 documents, all executed as a part of the same transaction, discloses the following:

Promissory Note

Provision (a) uses the word "maturity" in connection with the date March 6, 1984, but a true demand note is mature on issue.

Provision (b) is unnecessary, if the document is a true demand note, because a demand note is due on issue.

Provision (c), which is printed, contains an express waiver of demand. It is at least arguable that the insertion of the words "on demand" in provision (a) was intended to negate the printed waiver and to require a demand. Such a requirement might well have more than academic importance if, as the bank's attorney's letter of June 26 claimed, an attorney's fee of over $14,000 was then due, there having been no previous unequivocal demand.

Deed of Trust

Provision (a) is consistent with an installment note and not with a demand note.

Provision (c), a typewritten provision, is unnecessary if the promissory note is a demand note. The same is true of provision (e).

Provision (f) uses language of maturity which is inconsistent with a demand note.

Demand Note

This entire instrument is superfluous if the promissory note was in fact a demand note and the latter could have been used alone in conjunction with the deed of trust.

Provision (b) requires a demand and yet a demand note does not require such, at least in the absence of express provision.

Since provision (d) makes payment under the demand note conditioned upon default in the payment of the promissory note, this lends support to the argument that the words "on demand" in the promissory note were inserted to replace the demand waiver of provision (c) of the promissory note.

Federal Truth-in-Lending Statement

Provision (a) takes into consideration that the Reeses paid $1,846 in a prepaid finance charge (points) and will pay, over a three-year term, interest at 13 percent totaling $36,365.15. Using the foregoing factors, provision (c) calculates the annual percentage of interest to be 13.8 percent. That rate is not "subject to change." If the promissory note was a demand note and was called for payment any time prior to March 6, 1984, if all installments were paid timely, the annual rate would exceed 13.8 percent.

Provision (d) shows that a constant interest rate, rather than a variable one, was intended. The early call of the promissory note would cause a variance in the interest rate.

Although provision (e) is typewritten, so are portions of provisions (a), (b), (c) and (d).

If the bank's position were sound, the note was callable on issue and indeed the bank claimed that attorneys' fees exceeding $14,000 were due within three months after the making of the loan. The proud owners of a new house, faithful in their payments, would understandably be disheartened if the law accepted that position under the facts here. The bank's letter of April 14 betrayed some weakness in its position. If the note were what the bank claimed it to be, no clarification was necessary. The commitment letter made no mention of a demand note. The bank's loan report of March 8, in essence, is inconsistent with its position and indeed is cogent evidence of the falsity of the bank's letter which the secretary, understandably, refused to initial.

■ This court holds that the promissory note was an installment note and that it

was payable on demand only in the event of default in the making of the installment payments or the performing of the obligations imposed upon the Reeses by the deed of trust.[3] It follows that the trial court properly enjoined the foreclosure.

The subsidiary contention of the bank, with regard to admissibility of certain evidence, need not be considered. Ordinarily, in a court-tried case, rulings on evidence do not constitute prejudicial error and the challenged evidence, although consistent with the ruling of the trial court and with this opinion, did not play a role in this affirmance.

The judgment is affirmed.

SMITH, J., and RICHARD J. MEHAN, Special Judge, concur.

3. Although the decree of the trial court did not contain an express condition with regard to the Reeses' obligations under the deed of trust, the bank makes no complaint with respect thereto and nothing in the instant record indicates any non-performance of those obligations.